# KELLER ET AL. *v.* STATE BAR OF CALIFORNIA ET AL.

No. 88–1905.   Argued February 27, 1990—Decided June 4, 1990

REHNQUIST, C. J., delivered the opinion for a unanimous Court.

*Anthony T. Caso* argued the cause for petitioners. With him on the briefs were *Ronald A. Zumbrun* and *John H. Findley.*

*Seth M. Hufstedler* argued the cause for respondents. With him on the brief were *Robert S. Thompson, Laurie D.*

4

*Zelon, Judith R. Starr, Herbert M. Rosenthal,* and *Diane Yu.\**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners, members of respondent State Bar of California, sued that body, claiming its use of their membership dues to finance certain ideological or political activities to which they were opposed violated their rights under the First Amendment of the United States Constitution. The Supreme Court of California rejected this challenge on the grounds that the State Bar is a state agency and, as such, may use the dues for any purpose within its broad statutory authority. We agree that lawyers admitted to practice in the State may be required to join and pay dues to the State Bar, but disagree as to the scope of permissible dues-financed activities in which the State Bar may engage.

The State Bar is an organization created under California law to regulate the State's legal profession.[1] It is

---

*Briefs of *amici curiae* urging reversal were filed for the Ad Hoc Committee Opposing Lobbying and Certain Other Activities of a Mandatory Bar by *James J. Bierbower;* for the American Civil Liberties Union by *Steven R. Shapiro* and *John A. Powell;* for the National Right to Work Legal Defense Foundation by *Edwin Vieira;* for the Washington Legal Foundation et al. by *Daniel J. Popeo, Paul D. Kamenar,* and *John C. Scully;* for Robert E. Gibson by *Herbert R. Kraft;* for Trayton L. Lathrop, *pro se;* and for Joseph W. Little, *pro se.*

Briefs of *amici curiae* urging affirmance were filed for the American Bar Association by *L. Stanley Chauvin, Jr., Carter G. Phillips,* and *Mark D. Hopson;* for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold;* for the Beverly Hills Bar Association et al. by *Ellis J. Horvitz* and *Peter Abrahams;* for the California Legislature by *Bion M. Gregory;* for the Lawyers' Committee for the Administration of Justice by *James J. Brosnahan;* for the State Bar of Michigan et al. by *Michael Franck* and *Michael J. Karwoski;* and for the State Bar of Wisconsin et al. by *John S. Skilton, Barry S. Richard,* and *Stephen L. Tober.*

Steven Levine, *pro se,* filed a brief of *amicus curiae.*

[1] The State Bar's Board of Governors is also a respondent in this action. Accordingly, the terms "respondent" or "State Bar" will refer either to the

an entity commonly referred to as an "integrated bar"—an association of attorneys in which membership and dues are required as a condition of practicing law in a State. Respondent's broad statutory mission is to "promote 'the improvement of the administration of justice.'" 47 Cal. 3d 1152, 1156, 767 P. 2d 1020, 1021 (1989) (quoting Cal. Bus. & Prof. Code Ann. § 6031(a) (West Supp. 1990)). The association performs a variety of functions such as "examining applicants for admission, formulating rules of professional conduct, disciplining members for misconduct, preventing unlawful practice of the law, and engaging in study and recommendation of changes in procedural law and improvement of the administration of justice." 47 Cal. 3d, at 1159, 767 P. 2d, at 1023–1024 (internal quotation marks omitted). Respondent also engages in a number of other activities which are the subject of the dispute in this case. "[T]he State Bar for many years has lobbied the Legislature and other governmental agencies, filed amicus curiae briefs in pending cases, held an annual conference of delegates at which issues of current interest are debated and resolutions approved, and engaged in a variety of education programs." *Id.*, at 1156, 767 P. 2d, at 1021–1022. These activities are financed principally through the use of membership dues.

Petitioners, 21 members of the State Bar, sued in state court claiming that through these activities respondent expends mandatory dues payments to advance political and ideological causes to which they do not subscribe.[2] Assert-

organization itself, or the organization and its governing board, as the context warrants.

[2] Some of the particular activities challenged by petitioners were described in the complaint as follows:

(1) Lobbying for or against state legislation prohibiting state and local agency employers from requiring employees to take polygraph tests; prohibiting possession of armor-piercing handgun ammunition; creating an unlimited right of action to sue anybody causing air pollution; creating criminal sanctions for violation of laws pertaining to the display for sale of drug paraphernalia to minors; limiting the right to individualized education programs for students in need of special education; creating an unlimited

ing that their compelled financial support of such activities violates their First and Fourteenth Amendment rights to freedom of speech and association, petitioners requested, *inter alia*, an injunction restraining respondent from using mandatory bar dues or the name of the State Bar to advance political and ideological causes or beliefs. The trial court granted summary judgment to respondent on the grounds that it is a governmental agency and therefore permitted under the First Amendment to engage in the challenged activities. The California Court of Appeal reversed, holding that while respondent's regulatory activities were similar to those of a government agency, its "administration-of-justice" functions were more akin to the activities of a labor union. The court held that under our opinion in *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), such activities "could be financed from mandatory dues only if the particular action in question served a state interest important enough to overcome the interference with dissenters' First Amendment rights." 47 Cal. 3d, at 1159, 767 P. 2d, at 1023.

The Supreme Court of California reversed the Court of Appeal by a divided vote. The court reasoned that respond-

exclusion from gift tax for gifts to pay for education tuition and medical care; providing that laws providing for the punishment of life imprisonment without parole shall apply to minors tried as adults and convicted of murder with a special circumstance; deleting the requirement that local government secure approval of the voters prior to constructing low-rent housing projects; requesting Congress to refrain from enacting a guest-worker program or from permitting the importation of workers from other countries;

(2) Filing *amicus curiae* briefs in cases involving the constitutionality of a victim's bill of rights; the power of a workers' compensation board to discipline attorneys; a requirement that attorney-public officials disclose names of clients; the disqualification of a law firm; and

(3) The adoption of resolutions by the Conference of Delegates endorsing a gun control initiative; disapproving the statements of a United States senatorial candidate regarding court review of a victim's bill of rights; endorsing a nuclear weapons freeze initiative; opposing federal legislation limiting federal-court jurisdiction over abortions, public school prayer, and busing. App. 9–13.

ent's status as a public corporation, as well as certain of its other characteristics, made it a "government agency." It also expressed its belief that subjecting respondent's activities to First Amendment scrutiny would place an "extraordinary burden" on its mission to promote the administration of justice. *Id.*, at 1161–1166, 767 P. 2d, at 1025–1028. The court distinguished other cases subjecting the expenditures of state bar associations to First Amendment scrutiny, see, *e. g.*, *Gibson* v. *The Florida Bar*, 798 F. 2d 1564 (CA11 1986), on the grounds that none of the associations involved in those cases rested "upon a constitutional and statutory structure comparable to that of the California State Bar. None involves an extensive degree of legislative involvement and regulation." 47 Cal. 3d, at 1167, 767 P. 2d, at 1029. The court concluded that "the State Bar, considered as a government agency, may use dues for any purpose within the scope of its statutory authority." *Id.*, at 1168, 767 P. 2d, at 1030. With the exception of certain election campaigning conducted by respondent and its president, the court found that all of respondent's challenged activities fell within its statutory authority. *Id.*, at 1168–1173, 767 P. 2d, at 1030–1033. We granted certiorari, 493 U. S. 806 (1989), to consider petitioners' First Amendment claims. We now reverse and remand for further proceedings.

In *Lathrop* v. *Donohue*, 367 U. S. 820 (1961), a Wisconsin lawyer claimed that he could not constitutionally be compelled to join and financially support a state bar association which expressed opinions on, and attempted to influence, legislation. Six Members of this Court, relying on *Railway Employes* v. *Hanson*, 351 U. S. 225 (1956), rejected this claim.

> "In our view the case presents a claim of impingement upon freedom of association no different from that which we decided in *[Hanson]*. We there held that § 2, Eleventh of the Railway Labor Act . . . did not on its face

abridge protected rights of association in authorizing union-shop agreements between interstate railroads and unions of their employees conditioning the employees' continued employment on payment of union dues, initiation fees and assessments. . . . In rejecting Hanson's claim of abridgment of his rights of freedom of association, we said, 'On the present record, there is no more an infringement or impairment of First Amendment rights than there would be in the case of a lawyer who by state law is required to be a member of an integrated bar.' 351 U. S., at 238. Both in purport and in practice the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process. It cannot be denied that this is a legitimate end of state policy. We think that the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity. Given the character of the integrated bar shown on this record, in the light of the limitation of the membership requirement to the compulsory payment of reasonable annual dues, we are unable to find any impingement upon protected rights of association." *Lathrop*, 367 U. S., at 842–843 (plurality opinion) (footnote omitted).

Justice Harlan, joined by Justice Frankfurter, similarly concluded that "[t]he *Hanson* case . . . decided by a unanimous Court, surely lays at rest all doubt that a State may constitutionally condition the right to practice law upon membership in an integrated bar association, a condition fully as justified

by state needs as the union shop is by federal needs." *Id.*, at 849 (opinion concurring in judgment).

The *Lathrop* plurality emphasized, however, the limited scope of the question it was deciding: "[Lathrop's] compulsory enrollment imposes only the duty to pay dues. . . . We therefore are confronted, as we were in *[Hanson]*, only with a question of compelled financial support of group activities, not with involuntary membership in any other aspect." *Id.*, at 827–828 (footnote omitted). Indeed, the plurality expressly reserved judgment on Lathrop's additional claim that his free speech rights were violated by the Wisconsin Bar's use of his mandatory dues to support objectionable political activities, believing that the record was not sufficiently developed to address this particular claim.[3] Petitioners here present this very claim for decision, contending that the use of their compulsory dues to finance political and ideological activities of the State Bar with which they disagree violates their rights of free speech guaranteed by the First Amendment.

In *Abood* v. *Detroit Board of Education*, 431 U. S. 209 (1977), the Court confronted the issue whether, consistent with the First Amendment, agency-shop dues of nonunion public employees could be used to support political and ideological causes of the union which were unrelated to collective-bargaining activities. We held that while the Constitution did not prohibit a union from spending "funds for the expression of political views . . . or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative," the Constitution did require that such expenditures be "financed from charges, dues, or assessments paid by employees who [did] not object to advancing those ideas and who [were] not coerced into doing so against their will by the threat of loss of governmental employment." *Id.*, at 235–236. The Court noted that just as

---

[3] Justice Harlan would have reached this claim and decided that it lacked merit. See *Lathrop* v. *Donohue*, 367 U. S., at 848–865.

prohibitions on making contributions to organizations for political purposes implicate fundamental First Amendment concerns, see *Buckley* v. *Valeo*, 424 U. S. 1 (1976), "compelled . . . contributions for political purposes works no less an infringement of . . . constitutional rights." *Abood, supra,* at 234. The Court acknowledged Thomas Jefferson's view that "'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.'" 431 U. S., at 234–235, n. 31 (quoting I. Brant, James Madison: The Nationalist 354 (1948)). While the decision in *Abood* was also predicated on the grounds that a public employee could not be compelled to relinquish First Amendment rights as a condition of public employment, see 431 U. S., at 234–236, in the later case of *Ellis* v. *Railway Clerks,* 466 U. S. 435 (1984), the Court made it clear that the principles of *Abood* apply equally to employees in the private sector. See 466 U. S., at 455–457.

Although several federal and state courts have applied the *Abood* analysis in the context of First Amendment challenges to integrated bar associations, see 47 Cal. 3d, at 1166, 767 P. 2d, at 1028 (collecting cases), the California Supreme Court in this case held that respondent's status as a regulated state agency exempted it from any constitutional constraints on the use of its dues. "If the bar is considered a governmental agency, then the distinction between revenue derived from mandatory dues and revenue from other sources is immaterial. A governmental agency may use unrestricted revenue, whether derived from taxes, dues, fees, tolls, tuition, donation, or other sources, for any purposes within its authority." *Id.,* at 1167, 767 P. 2d, at 1029. Respondent also urges this position, invoking the so-called "government speech" doctrine: "The government must take substantive positions and decide disputed issues to govern. . . . So long as it bases its actions on legitimate goals, government may speak despite citizen disagreement with the content of its message, for government is not required to be content-neutral." Brief for

Respondents 16. See also *Abood, supra,* at 259, n. 13 (Powell, J., concurring in judgment) ("[T]he reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people").

Of course the Supreme Court of California is the final authority on the "governmental" status of the State Bar of California for purposes of state law. But its determination that respondent is a "government agency," and therefore entitled to the treatment accorded a governor, a mayor, or a state tax commission, for instance, is not binding on us when such a determination is essential to the decision of a federal question. The State Bar of California is a good deal different from most other entities that would be regarded in common parlance as "governmental agencies." Its principal funding comes, not from appropriations made to it by the legislature, but from dues levied on its members by the board of governors.[4] Only lawyers admitted to practice in the State of California are members of the State Bar, and all 122,000 lawyers admitted to practice in the State must be members. Respondent undoubtedly performs important and valuable services for the State by way of governance of the profession, but those services are essentially advisory in nature. The State Bar does not admit anyone to the practice of law, it does not finally disbar or suspend anyone, and it does not ultimately establish ethical codes of conduct. All of those functions are reserved by California law to the State Supreme Court. See Cal. Bus. & Prof. Code Ann. § 6064 (West 1974) (admissions); § 6076 (rules of professional conduct); Cal. Bus.

---

[4] In 1982, the year the complaint in this action was filed, approximately 85% of the State Bar's general funding came from membership dues with the balance made up of fees charged for various bar activities. The State Bar's general funds support the bulk of its activities with the exception of the State Bar's applicant admission functions and other miscellaneous activity. The State Bar's admission functions are not funded from general revenues but rather from fees charged to applicants taking the bar examination. App. 76–77.

& Prof. Code Ann. § 6100 (West Supp. 1990) (disbarment or suspension).

There is, by contrast, a substantial analogy between the relationship of the State Bar and its members, on the one hand, and the relationship of employee unions and their members, on the other. The reason behind the legislative enactment of "agency-shop" laws is to prevent "free riders"—those who receive the benefit of union negotiation with their employers, but who do not choose to join the union and pay dues—from avoiding their fair share of the cost of a process from which they benefit. The members of the State Bar concededly do not benefit as directly from its activities as do employees from union negotiations with management, but the position of the organized bars has generally been that they prefer a large measure of self-regulation to regulation conducted by a government body which has little or no connection with the profession. The plan established by California for the regulation of the profession is for recommendations as to admission to practice, the disciplining of lawyers, codes of conduct, and the like to be made to the courts or the legislature by the organized bar. It is entirely appropriate that all of the lawyers who derive benefit from the unique status of being among those admitted to practice before the courts should be called upon to pay a fair share of the cost of the professional involvement in this effort.

But the very specialized characteristics of the State Bar of California discussed above served to distinguish it from the role of the typical government official or agency. Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents. With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process. If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over

issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed. Cf. *United States* v. *Lee*, 455 U. S. 252, 260 (1982) ("The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief").

The State Bar of California was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession. Its members and officers are such not because they are citizens or voters, but because they are lawyers. We think that these differences between the State Bar, on the one hand, and traditional government agencies and officials, on the other hand, render unavailing respondent's argument that it is not subject to the same constitutional rule with respect to the use of compulsory dues as are labor unions representing public and private employees.

Respondent would further distinguish the two situations on the grounds that the compelled association in the context of labor unions serves only a private economic interest in collective bargaining, while the State Bar serves more substantial public interests. But legislative recognition that the agency-shop arrangements serve vital national interests in preserving industrial peace, see *Ellis*, 466 U. S., at 455–456, indicates that such arrangements serve substantial public interests as well. We are not possessed of any scales which would enable us to determine that the one outweighs the other sufficiently to produce a different result here.

*Abood* held that a union could not expend a dissenting individual's dues for ideological activities not "germane" to the purpose for which compelled association was justified: collective bargaining. Here the compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal serv-

ices.  The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members.  It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.  The difficult question, of course, is to define the latter class of activities.

Construing the Railway Labor Act in *Ellis, supra,* we held:

> "[W]hen employees such as petitioners object to being burdened with particular union expenditures, the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.  Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit." *Id.,* at 448.

We think these principles are useful guidelines for determining permissible expenditures in the present context as well. Thus, the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or "improving the quality of the legal service available to the people of the State." *Lathrop,* 367 U. S., at 843 (plurality opinion).

The Supreme Court of California decided that most of the activities complained of by petitioners were within the scope of the State Bar's statutory authority and were therefore not only permissible but could be supported by the compulsory dues of objecting members.  The Supreme Court of California quoted the language of the relevant statute to the effect

that the State Bar was authorized to "'aid in all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice.'" 47 Cal. 3d, at 1169, 767 P. 2d, at 1030. Simply putting this language alongside our previous discussion of the extent to which the activities of the State Bar may be financed from compulsory dues might suggest that there is little difference between the two. But there is a difference, and that difference is illustrated by the allegations in petitioners' complaint as to the kinds of State Bar activities which the Supreme Court of California has now decided may be funded with compulsory dues.

Petitioners assert that the State Bar has engaged in, *inter alia*, lobbying for or against state legislation (1) prohibiting state and local agency employers from requiring employees to take polygraph tests; (2) prohibiting possession of armor-piercing handgun ammunition; (3) creating an unlimited right of action to sue anybody causing air pollution; and (4) requesting Congress to refrain from enacting a guest-worker program or from permitting the importation of workers from other countries. Petitioners' complaint also alleges that the conference of delegates funded and sponsored by the State Bar endorsed a gun control initiative, disapproved statements of a United States senatorial candidate regarding court review of a victim's bill of rights, endorsed a nuclear weapons freeze initiative, and opposed federal legislation limiting federal-court jurisdiction over abortions, public school prayer, and busing. See n. 2, *supra*.

Precisely where the line falls between those State Bar activities in which the officials and members of the Bar are acting essentially as professional advisers to those ultimately charged with the regulation of the legal profession, on the one hand, and those activities having political or ideological coloration which are not reasonably related to the advancement of such goals, on the other, will not always be easy to discern. But the extreme ends of the spectrum are clear:

Compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative; at the other end of the spectrum petitioners have no valid constitutional objection to their compulsory dues being spent for activities connected with disciplining members of the Bar or proposing ethical codes for the profession.

In declining to apply our *Abood* decision to the activities of the State Bar, the Supreme Court of California noted that it would entail "an extraordinary burden. . . . The bar has neither time nor money to undertake a bill-by-bill, case-by-case *Ellis* analysis, nor can it accept the risk of litigation every time it decides to lobby a bill or brief a case." 47 Cal. 3d, at 1165–1166, 767 P. 2d, at 1028. In this respect we agree with the assessment of Justice Kaufman in his concurring and dissenting opinions in that court:

> "[C]ontrary to the majority's assumption, the State Bar would not have to perform the three-step *Ellis* analysis prior to each instance in which it seeks to advise the Legislature or the courts of its views on a matter. Instead, according to [*Teachers* v.] *Hudson*, [475 U. S. 292 (1986)] 'the constitutional requirements for the [association's] collection of . . . fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.' (*Id.* at 310). Since the bar already is statutorily required to submit detailed budgets to the Legislature prior to obtaining approval for setting members' annual dues (Bus. and Prof. Code § 6140.1), the argument that the constitutionally mandated procedure would create 'an extraordinary burden' for the bar is unpersuasive.
>
> "While such a procedure would likely result in some additional administrative burden to the bar and perhaps prove at times to be somewhat inconvenient, such additional burden or inconvenience is hardly sufficient to jus-

tify contravention of the constitutional mandate. It is noteworthy that unions representing government employees have developed, and have operated successfully within the parameters of *Abood* procedures for over a decade." *Id.*, at 1192, 767 P. 2d, at 1046 (citations and footnote omitted).

In *Teachers* v. *Hudson*, 475 U. S. 292 (1986), where we outlined a minimum set of procedures by which a union in an agency-shop relationship could meet its requirement under *Abood*, we had a developed record regarding different methods fashioned by unions to deal with the "free rider" problem in the organized labor setting. We do not have any similar record here. We believe an integrated bar could certainly meet its *Abood* obligation by adopting the sort of procedures described in *Hudson*. Questions whether one or more alternative procedures would likewise satisfy that obligation are better left for consideration upon a more fully developed record.

In addition to their claim for relief based on respondent's use of their mandatory dues, petitioners' complaint also requested an injunction prohibiting the State Bar from using its name to advance political and ideological causes or beliefs. See *supra*, at 5–6. This request for relief appears to implicate a much broader freedom of association claim than was at issue in *Lathrop*. Petitioners challenge not only their "compelled financial support of group activities," see *supra*, at 9, but urge that they cannot be compelled to associate with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop* and *Abood*. The California courts did not address this claim, and we decline to do so in the first instance. The state courts remain free, of course, to consider this issue on remand.

The judgment of the Supreme Court of California is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*