49 P.3d 285

**Steve MAY, Petitioner,**

v.

**The Honorable Colleen A. McNALLY, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,**

**Betsey Bayless, as Secretary of State of the State of Arizona, acting in her official capacity; Carol Springer, as Treasurer of the State of Arizona, acting in her official capacity; and the Citizens Clean Elections Commission; and Arizonans for Clean Elections, Real Parties in Interest.**

No. 1 CA–SA 02–0073.

Court of Appeals of Arizona,
Division 1, Department D.

June 17, 2002.

As Corrected June 19, 2002.

perior Court in Pima County, was designated to sit on this case.

Institute for Justice Arizona Chapter, By Clint Bolick, Timothy D. Keller, Thomas P. Liddy, Phoenix, and Institute for Justice, By William H. Mellor, Scott G. Bullock, Washington, DC, Attorneys for Petitioner.

Janet Napolitano, Attorney General, By Todd F. Lang, Assistant Attorney General, Phoenix, Attorneys for Real Party in Interest–Citizens Clean Elections Commission.

Arizona Center for Law in the Public Interest, By Timothy M. Hogan, Phoenix and Brennan Center for Justice at New York University School of Law, By Elizabeth Daniel, New York, NY, Attorneys for Real Party in Interest–Arizonans for Clean Elections.

## OPINION

WEISBERG, Judge.

¶ 1 Steve May ("Petitioner") seeks special action review of the trial court's decision upholding a provision of the Citizens Clean Elections Act (the "Act"), which permits certain fine surcharges to be distributed to political candidates. *See* Ariz.Rev.Stat. ("A.R.S.") § 16–954(C) (Supp.2001). For the reasons set forth below, we reverse the trial court's decision.

1. The First Amendment to the United States Constitution states, "Congress shall make no law ... abridging the freedom of speech, or of the press...." The Arizona Constitution, Article 2, Section 6, states, "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Section

## BACKGROUND AND PROCEDURAL HISTORY

¶ 2 In the 1998 general election, Arizona voters adopted the Act by approving initiative Proposition 200. The Act established a system of campaign finance whereby certain candidates could receive campaign funds in exchange for agreeing to limit campaign contributions and expenditures. The Act also lowered the contribution limits for non-participating candidates and imposed additional reporting requirements on all candidates.

¶ 3 The campaign funds were to be generated from four different sources: (1) a $5 state income tax check-off; (2) a dollar-for-dollar income tax credit for contributions to the fund up to $500 or twenty percent of taxes owed, whichever was greater; (3) a $100 annual mandatory fee imposed on certain classes of registered lobbyists; and (4) a ten percent surcharge imposed on persons paying civil and criminal fines, including those related to the stopping or standing of motor vehicles. *See* A.R.S. §§ 16–944, – 954(A) to (C) (Supp.2001).

¶ 4 Petitioner is a state legislator who received a parking ticket and was fined $27, which included a ten percent surcharge pursuant to the Act. Petitioner refused to pay the surcharge, claiming that it violated his free speech guarantees under the First Amendment to the United States Constitution and Article 2, Sections 6 and 15 of the Arizona Constitution.[1]

¶ 5 Petitioner originally brought an action in federal district court against the Secretary of State and Treasurer seeking a declaration of the Act's invalidity. Citizens Clean Elections Commission and Arizonans for Clean Elections ("ACE") intervened as defendants. In March 2001, the district court dismissed the action for lack of subject matter jurisdiction on the ground that it challenged a state tax and therefore should be initiated in state

15 states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." Because we conclude that the Act violates the First Amendment, we do not consider whether the Act similarly violates the Arizona Constitution.

court. *See Lavis v. Bayless*, No. CIV 99–1627 (D.Ariz. Mar. 13, 2001).

¶ 6 Petitioner re-filed the action in state court in April 2001. The parties stipulated to the facts and filed cross-motions for summary judgment. In December 2001, the trial court granted Petitioner's motion in part, enjoining the collection of the lobbyist fee and severing that provision from the remainder of the Act.[2] Petitioner then filed a petition for special action in the Arizona Supreme Court, but the court declined to exercise jurisdiction. Petitioner therefore re-filed his special action petition in this court against ACE, the Citizens Clean Elections Commission, and the Secretary of State and Treasurer, as real parties in interest. Only ACE has filed a response.

■ ¶ 7 This matter involves a purely legal issue that is appropriate for resolution by special action in this court. *See Univ. of Ariz. Health Scis. Ctr. v. Superior Court*, 136 Ariz. 579, 581, 667 P.2d 1294, 1296 (1983) (accepting special action jurisdiction over matter of important public interest that turns entirely on legal issues). This case also presents an important constitutional issue involving the Act and is a matter of statewide importance. *See State ex rel. Woods v. Block*, 189 Ariz. 269, 272, 942 P.2d 428, 431 (1997). Further, there is no adequate remedy by appeal. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). We therefore exercise our discretion and accept jurisdiction.

## DISCUSSION

■ ¶ 8 We must decide the constitutionality of the provision of the Act that imposes a ten percent surcharge on all individuals who incur civil and criminal fines. *See* A.R.S. § 16–954(C). Although "the legislature need not look to an express grant of authority in order to justify an enactment," "any exercise of legislative power is subject to the limitations imposed by the constitu-

tion." *Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516, 520, ¶ 14, 1 P.3d 706, 710 (2000). A constitutional limitation on the exercise of legislative power "may be implied by the text of the constitution or its structure taken as a whole." *Id.* at 521, ¶ 14, 1 P.3d at 711. "That [the Act] was enacted directly by the voters rather than by the state legislature does not change our constitutional analysis. '[V]oters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation.'" *Serv. Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1314 n. 1 (9th Cir.1992) (second alteration in original) (quoting *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 295, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981)).

### History of Cases

¶ 9 Beginning in 1976, the United States Supreme Court has addressed whether compelled fees similar to those imposed by the Act violate the First Amendment's right to freedom of speech. We begin by examining those cases.

¶ 10 *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), involved the constitutionality of a portion of a federal act that allowed taxpayers to designate that one or two of their tax dollars be paid into a presidential election fund. *Id.* at 86, 96 S.Ct. 612. The money from the fund would then be distributed to qualified political parties. *Id.* at 87–90, 96 S.Ct. 612. Taxpayers challenged the dollar check-off provision because they were not able to designate particular candidates or parties as recipients of their money. *Id.* at 91, 96 S.Ct. 612. The Court rejected the challenge, finding that the funding was "like any other appropriation from the general revenue" and that Congress always used public money in a manner to which some taxpayers objected. *Id.* at 91–92, 96 S.Ct. 612. The Court further commented that the provision represented an effort to "use public money to facilitate and enlarge public discussion and participation in the electoral process." *Id.* at 92–93, 96 S.Ct. 612.

---

**2.** The trial court's order enjoining the collection of the lobbyist fee and severing that provision from the remainder of the Act has not been challenged on appeal.

¶ 11 In *Abood v. Detroit Board of Education*, 431 U.S. 209, 234–36, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and *Keller v. State Bar of California*, 496 U.S. 1, 13–14, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), the Court considered the constitutionality of subsidies levied by work-related associations and whether the subsidies were germane to the purposes of the associations. In *Abood*, non-union public school teachers challenged an agreement requiring them to pay a service fee equivalent to union dues. 431 U.S. at 211, 97 S.Ct. 1782. The objecting teachers claimed that the union's use of the fees to engage in political speech violated their freedom of association as guaranteed by the First and Fourteenth Amendments to the United States Constitution. *Id.* at 213, 97 S.Ct. 1782. The Supreme Court agreed. It held that requiring teachers to pay a service fee used "to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative" was unconstitutional. *Id.* at 234, 97 S.Ct. 1782.

¶ 12 In *Keller,* the Supreme Court struck down the use of mandatory state bar dues for political advocacy. 496 U.S. at 13–14, 110 S.Ct. 2228. It held that, although the state bar could fund activities "germane" to the association's mission of "regulating the legal profession and improving the quality of legal services," it could not fund activities of an ideological nature that fell outside the scope of regulating the legal profession. *Id.*

¶ 13 A few years later, the Supreme Court upheld a mandatory fee imposed in a university setting. *Bd. of Regents v. Southworth,* 529 U.S. 217, 229–30, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). Students had brought suit against their university, alleging that an activity fee, which was used to support student organizations that engaged in political speech, violated their First Amendment rights. *Id.* at 221, 120 S.Ct. 1346. The Supreme Court upheld the fee and specifically declined to engage in the germane analysis applied in *Abood* and *Keller.* *Id.* at 231–32, 120 S.Ct. 1346. The Court explained that,

In *Abood* and *Keller,* the constitutional rule took the form of limiting the required subsidy to speech germane to the purposes of the union or bar association. The standard of germane speech as applied to student speech at a university is unworkable, however, and gives insufficient protection both to the objecting students and to the University program it-self.…

The speech the University seeks to encourage in the program before us is distinguished not by discernable limits but by its vast, unexplored bounds. To insist upon asking what speech is germane would be contrary to the very goal the University seeks to pursue. It is not for the Court to say what is or is not germane to the ideas to be pursued in an institution of higher learning.

*Id.*

¶ 14 Determining that students in a university setting had protectable First Amendment interests, the Court found that the requirement of viewpoint neutrality in the program was sufficient to protect those interests. *Id.* at 233, 120 S.Ct. 1346. Thus, "[w]hen a university requires its students to pay fees to support the extracurricular speech of other students, all in the interest of open discussion, it may not prefer some viewpoints to others." *Id.* Because the university program respected the principle of viewpoint neutrality, the Court found the program to be consistent with the First Amendment. *Id.* at 234, 120 S.Ct. 1346.

¶ 15 Next, in *United States v. United Foods, Inc.,* 533 U.S. 405, 408–12, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001), the Supreme Court considered whether a mandatory fee imposed on mushroom handlers to fund advertisements that promoted mushroom sales in general violated the First Amendment. United Foods refused to pay the mandatory fee, claiming that it violated the First Amendment, *id.* at 409, 121 S.Ct. 2334, and asserting that it wanted to convey a message that "its brand of mushrooms was superior to those brands grown by other producers." *Id.* at 411, 121 S.Ct. 2334. It complained that it was being forced to pay for a message that any mushrooms were worth consuming, regardless of brand. *Id.*

¶ 16 Before addressing whether the mandatory fee was constitutional, the Court stated that "a threshold inquiry must be whether

there is some state imposed obligation which makes group membership less than voluntary; for it is only the overriding associational purpose which allows any compelled subsidy for speech in the first place." *Id.* at 413, 121 S.Ct. 2334. The Court distinguished between cases such as *Abood* and *Keller*, in which objecting members associated for purposes other than paying the subsidies, and *United Foods*, in which mushroom producers did not associate for any purpose other than to pay the fee. *Id.* at 411–12, 121 S.Ct. 2334. The Court implied that the latter group was involuntary and therefore subject to a higher standard of scrutiny than the former group. *Id.* at 414, 121 S.Ct. 2334. Ultimately, the Court declared that the mandatory fee imposed on the involuntary group of mushroom handlers was unconstitutional because the subsidizing fee was not germane to any *associational* purpose beyond the promoted speech itself. *Id.* at 415–16, 121 S.Ct. 2334 ("[T]he expression [the mushroom producers are] required to support is not germane to a purpose related to an association independent from the speech itself. . . .").

### Trial Court Decision

¶ 17 The trial court relied on *Southworth* in upholding the surcharge. The court reasoned that the surcharge, similar to the activity fee in *Southworth*, facilitated viewpoint neutral speech because there was no required political position that a candidate must adopt in order to qualify for funding. We, however, find that *Southworth* is not applicable here because it merely stated an exception to the rule rather than the rule itself. That exception was that, in a university setting, "[t]he standard of germane speech as applied to student speech . . . is unwork-

able." 529 U.S. at 231, 120 S.Ct. 1346. Accordingly, a university is treated differently because its mission is to "develop human resources, to discover and disseminate knowledge, to extend knowledge and its application beyond the boundaries of its campuses and to serve and stimulate society by developing in students heightened intellectual, cultural and humane sensitivities . . . and a sense of purpose." *Id.* at 221, 120 S.Ct. 1346 (internal quotation marks omitted). Thus, in that setting, a court must dispense with the germane analysis otherwise mandated by *Abood* and *Keller*.

¶ 18 Here, unlike *Southworth*, there is no equally compelling interest to promote speech when the individuals paying the surcharge and the political speech they fund have no connection. Unlike the students in *Southworth* who *directly* benefitted from the free speech, the surcharge payers are not directly benefitted. Thus the exception applicable in a university setting does not apply in this setting.[3] We, therefore, hold that the trial court erred in applying the principles of *Southworth* to this case.[4]

### Nature of the Surcharges

¶ 19 As discussed in *Buckley*, our threshold question is whether the surcharge is more akin to a general tax or to a regulatory fee. The Court in *Buckley* implied that, if it were the former, the surcharge would be constitutional,[5] but not if it were the latter. 424 U.S. at 91–92, 96 S.Ct. 612 (noting that a voluntary tax check-off provision "is like any other appropriation from the general revenue").

¶ 20 There is a significant distinction between funding a political campaign through a

3. Moreover, the activity fees in *Southworth* funded extracurricular speech, while here the surcharge funds political campaigns. In fact, the university's policies in *Southworth* specifically provided that the activity fee could not be disbursed to groups having a primarily political orientation or to groups that would use such funds for politically partisan purposes, *see id.* at 225–26, 120 S.Ct. 1346, whereas the funds here are used specifically for such purposes.

4. We note that, although the mandatory advertising fee in *United Foods* arguably benefitted some of the mushroom handlers, the Court did not

apply or even discuss the holding of *Southworth*, which was decided a year earlier. We determine that the Court omitted *Southworth* from its discussion because *Southworth* applied distinctly to a university setting that was not present in *United Foods*. For this reason, we similarly do not further consider *Southworth* here.

5. Because we do not find that the surcharges are akin to a general tax, we need not consider whether the Court in *Buckley* conclusively held that a general tax is constitutional under the First Amendment.

general tax and funding it through a surcharge. An individual who pays a general tax is paying a fee to generally benefit the community; that individual does not have an expectation as to how the funds will be used. Likewise, when the government collects a general tax, it is not collecting the tax for a specific purpose. If and when the government uses existing revenue to fund political campaigns, there is no violation of any individual's expectation—the funds already exist.

¶ 21 In contrast, an individual who incurs a civil or criminal fine has no expectation that he or she will incur an additional fee to support political campaigns. That individual has no choice in whether to fund or how much to fund such campaigns. In addition, unlike a general tax, the surcharge is not taken from existing government funds; instead, it is an additional charge imposed on a limited group of individuals. We therefore find that the surcharge is more akin to a regulatory fee than to a general tax.

¶ 22 In reaching this conclusion, we find helpful the discussion in *Bidart Brothers v. California Apple Commission*, 73 F.3d 925, 930 (9th Cir.1996), concerning the distinction between a general tax and a regulatory fee:

> [The cases] have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.
>
> Courts facing cases that lie near the middle of this spectrum have tended (sometimes with minor differences reflecting the different statutes at issue) to emphasize the revenue's ultimate use, asking

whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's costs of regulation.

*Id.* (quoting *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n*, 967 F.2d 683, 685 (1st Cir.1992)). Here, the surcharge is imposed upon a specific group of individuals, placed in a special fund, and geared toward a specific purpose: political campaigns. The participating politicians directly benefit from the funds. Accordingly, the surcharge is more like a regulatory fee than a general tax.[6]

### Creation of an Association

¶ 23 We next consider whether the individuals who incur civil and criminal fines thereby become an association and, if so, whether that association is voluntary. *See United Foods*, 533 U.S. at 413, 121 S.Ct. 2334 ("[A] threshold inquiry must be whether there is some state imposed obligation which makes group membership less than voluntary; for it is only the overriding associational purpose which allows any compelled subsidy for speech in the first place."). *United Foods* required that involuntary associations be subject to a higher standard of scrutiny than voluntary associations. *Id.* at 414, 121 S.Ct. 2334.

¶ 24 In *United Foods*, the mushroom handlers were not part of an organization related to growing or distributing mushrooms. However, they involuntarily became part of an association by virtue of their duty to pay the mandatory advertising fee. *Id.* at 412–14, 121 S.Ct. 2334. We liken the situation in this case to that in *United Foods* and find that the individuals who must pay the civil and criminal fines compose an involuntary association. Here, the surcharge is imposed upon a discrete group of individuals—those who incur civil and criminal fines—who are not otherwise associated. Thus, these persons are forced to associate by virtue of the mandatory surcharge.

---

6. We respectfully disagree with the district court's characterization of the surcharges as a tax and not a regulatory fee. *See Lavis*, No. CIV 99–1627, slip op. at 4–9.

### Germane Speech

¶ 25 Having determined that the surcharge is more akin to a regulatory fee than a general tax and that it creates an involuntary association, we engage in the next step of constitutional analysis: determining whether the speech that is being supported is germane to the purpose of the association. *See Abood,* 431 U.S. at 234–36, 97 S.Ct. 1782; *see also Keller,* 496 U.S. at 13–14, 110 S.Ct. 2228.[7] Petitioner asserts that the trial court skipped this step and that, had it completed it, the court would have found that the individuals who are compelled to pay the surcharge have no connection to the political speech the surcharge helps fund. Also, Petitioner asserts that, because the very purpose of the Act is to promote speech, the surcharge is unconstitutional under *United Foods. See* 533 U.S. at 415, 121 S.Ct. 2334 ("We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself.").

¶ 26 ACE counters that the lack of connection between Petitioner and the message his payment helps fund is an important distinguishing factor from *Abood* and *Keller,* in which the plaintiffs were compelled to pay dues to organizations with which they were closely associated (a teacher's union and a state bar). However, this distinction does not address the issue of germaneness as the thrust of the germaneness test set forth in *Abood, Keller,* and *United Foods* is that the message must be closely connected or "germane" to the association's purpose. Because this standard is not met here, the surcharge is unconstitutional.

¶ 27 The individuals who incur a civil or criminal fine do not have anything in common except their duty to pay the fine. The political messages the surcharge enables are not related to any overriding purpose shared by these involuntarily associated individuals.

¶ 28 Furthermore, the fee is collected for the sole purpose of supporting political speech. *See Buckley,* 424 U.S. at 21, 96 S.Ct. 612 (holding that contributions to political campaigns are a form of speech protected by the First Amendment because such contributions reflect an "expression of support for the candidate and his views"). Under *Abood, Keller,* and *United Foods,* such a purpose cannot be supported by a surcharge levied upon an involuntary association.

¶ 29 We find support for our conclusion in the reasoning of the Florida Supreme Court in *State ex rel. Butterworth v. Republican Party,* 604 So.2d 477, 480 (Fla.1992), which invalidated on First Amendment grounds an assessment imposed upon political organizations that was earmarked for a campaign finance fund:

> [S]ingling out political parties and associations to support the fund bears no relationship to the interest advanced. There are equally effective means of supporting the trust fund without infringing on the appellees' constitutional rights, such as devoting a larger percentage of the filing fees to the fund or supporting the fund through general revenues.

(Footnote omitted). Similarly, singling out civil and criminal violators to pay the surcharge bears no relationship to the interest of funding a particular elections system. The purpose of the Act may be advanced only through other means which do not violate these individuals' rights.

¶ 30 We therefore conclude that the surcharge violates the exercise of free speech under the United States Constitution because it is imposed upon a discrete group of individuals who are involuntarily associated and because the supported speech is not germane to the purpose of that association.

### CONCLUSION

¶ 31 Based on the holdings of *Buckley, Abood, Keller,* and *United Foods,* we conclude that A.R.S. § 16–954(C), authorizing a surcharge on civil and criminal fines to finance state elections, imposes an unconstitutional restraint on the exercise of free speech. Because it is severable from the remainder of the Act, the Secretary of State and Treasurer are enjoined from further im-

---

7. Our review necessarily does not consider whether the mandatory fee supports a laudable goal.

plementing and performing their duties in administering and enforcing A.R.S. § 16–954(C).

CONCURRING: JON W. THOMPSON, and JOHN C. GEMMILL, Judges.