SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STEVE MAY, | ) | Arizona Supreme Court |
| | ) | No. CV-02-0215-PR |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Court of Appeals |
| | ) | Division One |
| HON. COLLEEN A. McNALLY, Judge | ) | No. 1 CA-SA 02-0073 |
| of the SUPERIOR COURT OF THE | ) | |
| STATE OF ARIZONA, in and for the | ) | |
| County of Maricopa, | ) | Maricopa County |
| | ) | Superior Court |
| Respondent Judge, | ) | No. CV 2001-006078 |
| | ) | |
| BETSEY BAYLESS, as Secretary of | ) | |
| the State of Arizona, acting in | ) | |
| her official capacity; CAROL | ) | **O P I N I O N** |
| SPRINGER, as Treasurer of the | ) | |
| State of Arizona, acting in her | ) | |
| official capacity; and the | ) | |
| CITIZENS CLEAN ELECTIONS | ) | |
| COMMISSION; and ARIZONANS FOR | ) | |
| CLEAN ELECTIONS, | ) | |
| | ) | |
| Real Parties in Interest. | ) | |
| | ) | |

Special Action from the Superior Court of Maricopa County
The Honorable Colleen A. McNally, Judge
**JUDGMENT AFFIRMED**

_____

Court of Appeals, Division One
203 Ariz. 13, 49 P.3d 285 (App. 2002)
**OPINION VACATED**

_____

INSTITUTE FOR JUSTICE ARIZONA CHAPTER                         Phoenix
      by   Clint Bolick
      and  Timothy D. Keller
           Thomas P. Liddy
Attorneys for Petitioner

THOMAS P. PROSE, Acting Arizona Attorney                    Phoenix
        General in this case and Chief
        Assistant Attorney General
    by   Kathleen P. Sweeney, Assistant Attorney General
    and  Todd F. Lang, Assistant Attorney General
Attorneys for Real Party in Interest
        Citizens Clean Elections Commission

ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST              Phoenix
    by   Timothy M. Hogan
    and
THE BRENNAN CENTER FOR JUSTICE AT                     New York, NY
NEW YORK UNIVERSITY SCHOOL OF LAW
    by   Elizabeth Daniel
Attorneys for Real Party in Interest
        Arizonans for Clean Elections

PACIFIC LEGAL FOUNDATION                              Sacramento, CA
    by   Deborah J. La Fetra
Attorneys for Amicus Curiae Pacific Legal Foundation

**B E R C H**, Justice

¶1       In the 1998 general election, Arizona voters approved the Citizens Clean Elections Act to "encourage citizen participation in the political process, and . . . promote freedom of speech under the U.S. and Arizona Constitutions," and to "create a clean elections system that will improve the integrity of Arizona state government by diminishing the influence of special-interest money." Ariz. Rev. Stat. ("A.R.S.") § 16-940(A) (Supp. 2001).  The Act provides public financing for the campaigns of qualifying candidates for certain elected offices.  *See id.* §§ 16-940 to -961 (Supp. 2001).  This case presents a challenge to the Act's key funding provision.

¶2       The Act created the Citizens Clean Election Commission

("CCEC"), which oversees the disbursement of funds to qualifying candidates. To fund the campaigns of "clean elections" candidates, the CCEC collects funds from four sources: voluntary contributions to the fund, funds earmarked through a "check-off" provision on state income tax returns, a fee on certain registered lobbyists, and a ten percent surcharge on civil and criminal fines. *Id.* §§ 16-944, 16-954(A)-(C). We are asked to determine whether the ten percent surcharge on criminal and civil fines required by A.R.S. § 16-954(C) violates the First Amendment by impermissibly compelling those who pay the fines to support the speech of political candidates whom they might not otherwise support. We hold that it does not.

## BACKGROUND

¶3      Petitioner Steve May, then an Arizona state legislator, received a parking ticket and was fined $27, on which a ten percent surcharge authorized by the Act was assessed. May refused to pay the $2.70 surcharge, claiming that doing so would violate his First Amendment right to free speech because the money might be used to fund the campaigns of candidates whose views he opposed. He also challenged the fee on registered lobbyists.

¶4      May filed a federal court action, which was dismissed on the ground that the Tax Injunction Act, 28 U.S.C. § 1341, deprived the court of subject matter jurisdiction. *See Lavis v. Bayless*, No. CIV 99-1627 (D. Ariz. Mar. 13, 2001). He then filed his action

in Maricopa County Superior Court, urging the state courts to find the Act unconstitutional. The Citizens Clean Elections Commission and Arizonans for Clean Elections, the group that sponsored the initiative, intervened in support of the Act's constitutionality. The trial court upheld the constitutionality of the surcharge on civil and criminal fines, but invalidated the fee assessed against certain registered lobbyists. *May v. Bayless*, No. CV 2001-006078 (Mar. Cnty. Super. Ct. Apr. 2, 2002). The latter ruling was not appealed.

¶5 The court of appeals reversed, finding the surcharge an unconstitutional restraint on free speech and enjoining the State from imposing it. *May v. McNally*, 203 Ariz. 13, 49 P.3d 285 (App. 2002).

¶6 We stayed the court of appeals opinion and granted review to determine whether the surcharge provision of the Clean Elections Act impermissibly compels political speech of the surcharge payers, in violation of the First Amendment's guarantee of freedom of speech.

## DISCUSSION

¶7 Our analysis is framed by the United States Supreme Court's opinion in *Buckley v. Valeo*, 424 U.S. 1, 92-93 (1976), which recognized that government may properly use public funds to

establish a system of campaign financing.[1]  In *Buckley*, the Court considered, among other issues, the constitutionality of the Presidential Election Campaign Fund, a provision of the Federal Election Campaign Act of 1971 that allowed taxpayers a one dollar check-off on income tax returns that resulted in a dollar-for-dollar allocation out of the general fund to qualifying presidential candidates.  *Id.* at 86-87.

¶8      Those opposing the Presidential Campaign Fund argued that they should be allowed to designate the candidate to whom their dollar contribution would go.  But the Court disagreed, noting that the campaign fund "is like any other appropriation from the general revenue except that its amount is determined [by the number of check-offs]."  *Id.* at 91.  The fact that the contributions stemmed from a voluntary check-off "does not constitute the appropriation any less an appropriation by Congress."  *Id.*  Rather, the "check-off is simply the means by which Congress determines the amount of its appropriation."  *Id*. at 91 n.124.  The Court was not moved by the taxpayers' objection to the potential use of the funds for candidates the taxpayers opposed.  It noted that every congressional appropriation "uses public money in a manner to which some taxpayers object."  *Id.* at 92.

---

[1]      *Accord Little v. Florida Dep't of State*, 19 F.3d 4, 5 (11th Cir. 1994) (holding that financing campaigns with public funds does not violate First Amendment); *Libertarian Party v. Packard*, 741 F.2d 981, 989-90 (7th Cir. 1984) (same).

¶9 The Court determined that the check-off provision of the Presidential Campaign Fund did not implicate the First Amendment because the provision was designed to use public money "not to abridge, restrict, or censor speech, but rather . . . to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." *Id.* at 92-93. Accordingly, the Court concluded, public funding of presidential campaigns "furthers, not abridges, pertinent First Amendment values." *Id.* at 93.

¶10 *Buckley* thus affirms the proposition that the public financing of political candidates, in and of itself, does not violate the First Amendment, even though the funding may be used to further speech to which the contributor objects.[2]

¶11 May nonetheless maintains that, despite *Buckley*'s general approval of public financing of political campaigns, three cases decided by the Court after *Buckley* compel a different result in the case before us. Those cases – *Abood*, *Keller*, and *United Foods* – hold that discrete groups of individuals cannot be compelled to fund speech that they find objectionable unless that speech is germane to the group's purpose. May urges that the *Abood* line of

---

[2] Indeed, *Buckley* suggests that Congress could have funded the Federal Election Campaign Act out of the general revenue regardless of whether the funding system included the voluntary check-off provision, *see* 424 U.S. at 91-92, and May concedes that if the money had gone into the general fund and could not be traced to any individual, there would be no constitutional problem.

cases should guide our inquiry.

¶12      In *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), non-union schoolteachers were required to pay a service charge to the teachers' union. The union used the money for several purposes, including funding political and ideological activities that some non-union teachers found objectionable. *Id.* at 212-13. The Court held that unions could spend union dues to support political candidates and causes, but could use only "such expenditures . . . from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." *Id.* at 235-36.

¶13      Similarly, in *Keller v. State Bar of California*, 496 U.S. 1 (1990), California lawyers were required to join the state bar association and pay dues as a condition of practicing law in the state. As it had in *Abood*, the Court held that an organization such as a bar association, in which membership is a condition of employment, may use funds generated from mandatory membership fees for activities "germane" to the organization, but it could not use those funds to advocate or support ideological viewpoints "not 'germane' to the purpose for which compelled association was justified." *Id.* at 13.

¶14      Finally, in *United States v. United Foods, Inc.*, 533 U.S. 405 (2001), the Court invalidated fees charged to mushroom handlers

-7-

to fund advertisements promoting mushroom sales because the speech was not germane to a larger regulatory purpose of the association.

¶15    The *Abood* line of cases instructs that government may not condition involuntarily associated individuals' opportunity to receive a benefit or ply their trade or profession upon their compelled support of speech with which they disagree.  We note, however, that no benefit is being conditioned upon the payment of the surcharge at issue here, nor is payment of the surcharge a precondition to employment.  The opportunity to commit a crime or park illegally is not deserving of the same protection as is the opportunity to participate in lawful activity contemplated by the Supreme Court in the *Abood* line of cases.

¶16    Importantly, the "germaneness test" derived from the *Abood* line of cases is predicated upon the existence of an association.  An association is a "gathering of people for a common purpose; the persons so joined."  BLACK'S LAW DICTIONARY 119 (7th ed. 1999).  In this case, the surcharge payers have not joined together for a common purpose.  At best, the group consists of tens of thousands of otherwise unrelated individuals who, at one time or another, paid a civil or criminal fine.  Indeed, May conceded at oral argument and in his brief that "there is no association." This stands in sharp contrast to the associations in *Abood*, *Keller*, and *United Foods*, whose members were linked by a common purpose. The Act, then, does not create an association of fine payers, and

without an association by which to measure the germaneness of the speech, the *Abood* analysis is inapplicable.

¶17      Finally, and critically, the speech in *Abood*, *Keller*, and *United Foods* was viewpoint driven.  In all three cases, the organization chose the funded speech based on its content.  Thus, the objectors were compelled to be associated with a group message with which they disagreed.  Here, the Clean Elections Act allocates money to all qualifying candidates, regardless of party, position, or message, *see* A.R.S. § 16-951, and thus the surcharge payers are not linked to any specific message, position, or viewpoint.  The viewpoint neutrality of the disposition of funds distinguishes this case from *Abood*, *Keller*, and *United Foods*.  We therefore conclude that the *Abood* line of cases does not control the disposition of this case.

¶18      The Real Parties in Interest urge us instead to apply the analysis in *Board of Regents v. Southworth*, 529 U.S. 217 (2000), in assessing the constitutionality of the Clean Elections Act.  In *Southworth*, a state university allocated part of a mandatory student fee, on a viewpoint-neutral basis, to various student organizations engaged in ideologically expressive activities.  *Id.* at 222-24.  To qualify for funding, student organizations had to agree to certain accounting requirements and spending limitations.

¶19      The Court acknowledged that once the university

conditioned the opportunity to obtain an education on an agreement to support objectionable speech, the First Amendment was implicated. *Id.* at 231. But it rejected the germaneness test applied in *Abood* and *Keller* as "unworkable" in the context of extracurricular student speech at a university. *Id.* Recognizing that the university's sole purpose in charging the fee was to facilitate "the free and open exchange of ideas by, and among, students," the Court reasoned that "asking what speech is germane would be contrary to the very goal the University seeks to pursue." *Id.* at 229-32. Instead, the Court determined that "the principal standard of protection for objecting students . . . is the requirement of viewpoint neutrality in the allocation of funding support." *Id.* at 233. Although the Court acknowledged that some students were required to pay fees to subsidize speech they found "objectionable, even offensive," the viewpoint neutrality requirement of the student fee program sufficiently protected the students' First Amendment rights. *Id.* at 230.[3]

¶20    In the case before us, the court of appeals did not find *Southworth* informative, concluding that its analysis applied only in the university setting. *See May*, 203 Ariz. at 18, ¶ 17, 49 P.3d

---

[3]    Concurring, Justice Souter observed that the relationship between the fee payer and the objectionable speech was attenuated because the money was distributed in a neutral manner by an agency that had "no social, political, or ideological character." *Southworth*, 529 U.S. at 240 (Souter, J., concurring). The same is true in this case.

at 290.  We think otherwise.  While a university is certainly one venue in which the free and open exchange of ideas is encouraged, it is not the only one.  Encouraging public debate in the political arena is at least as compelling a public purpose as encouraging speech on a university campus.  Moreover, limiting *Southworth* to a university setting overlooks the thrust of the Court's analysis: If the government seeks to facilitate or expand the universe of speech and accomplishes its goal in a viewpoint neutral way, the question whether speech is germane is simply inapposite.

¶21    We find the *Southworth* approach better suited than the *Abood* line of cases for analyzing the constitutionality of the Clean Elections Act.  The university's goals in *Southworth* and the government's goals in funding clean elections are similar:  Both seek to facilitate free speech.  Moreover, both funding systems protect free speech rights by requiring viewpoint neutrality in the allocation of funds and attenuating the connection between the payers of funds and the message communicated.  The principles of *Buckley* – that government may use public funds to finance political speech – and *Southworth* – that viewpoint neutrality in the allocation of funds adequately safeguards First Amendment rights – support the conclusion that collecting a surcharge on civil and criminal fines to fund political campaigns does not violate the First Amendment.

¶22    But May counters that the Act is not viewpoint neutral in

two respects.  First, he contends that fine payers are forced to support the viewpoint that public financing of campaigns represents good public policy.  Yet, as *Buckley* noted, "every appropriation made by [government] uses public money in a manner to which some taxpayers object."  424 U.S. at 92.  For example, taxes from the state's general fund are used to pay the salaries of state legislators, some of whom an individual taxpayer might support and others whom the taxpayer might not support.  Yet no one would suggest that such payments violate the First Amendment.  But government could not function if taxpayers could refuse to pay taxes if they disagreed with the government policy or function that the tax supported.[4]  *See United States v. Lee*, 455 U.S. 252, 260 (1982); *see also Southworth*, 529 U.S. at 229.  Second, May argues that not all candidates request and receive campaign funds.  But *Southworth*'s insistence on viewpoint neutrality focused on the government's method of allocating funds, not the resulting viewpoints being supported.  *Southworth*, 529 U.S. at 233.  The method of allocating funds under the Clean Elections Act is clearly neutral with regard to the ideology or message of any candidate and

---

[4]      The State makes considerable use of surcharges to fund various public programs.  *See, e.g.*, A.R.S. § 12-116.01(A) (criminal justice enhancement fund); A.R.S. § 12-116.02 (medical services enhancement fund); A.R.S. § 12-116.01(B) (fill the gap fund); A.R.S. § 12-116.01(C) (DNA fund).

thus passes muster under *Southworth*.[5]

**¶23**     In a final salvo, amicus participant Pacific Legal Foundation urges that, while "tax dollars . . . may be spent on expressive activity without violating taxpayers' First Amendment rights," the surcharge at issue here is a fee, not a tax, and therefore must be analyzed differently. We conclude, however, that whether the surcharge is a tax or a fee is not dispositive of the issues in this case. Government may no more violate the First Amendment by imposing a tax than it may by imposing a fee. Moreover, we have not discovered any compelled funding case in

---

[5]     May urges that two cases that have invalidated campaign funding schemes should guide the disposition of this case. We do not find either case applicable. In *Butterworth v. Florida*, 604 So. 2d 477 (Fla. 1992), the Florida Supreme Court struck down a 1.5% assessment on some contributions to political parties, which assessment was used to fund political campaigns. The court held that the assessment "infringes on First Amendment rights by forcing contributors to decide between contributing to a party and financing causes or persons with whom they disagree or not contributing to a party at all." *Id.* at 481. The Florida statute directly burdened political contributions, which implicated First Amendment speech and association rights that are not burdened under the Arizona law.

In *Vermont Society of Association Executives v. Milne*, 779 A.2d 20 (Vt. 2001), the Supreme Court of Vermont ruled that a tax on lobbyists used to fund political campaigns violated the lobbyists' First Amendment rights. As indicated in ¶ 4 of this opinion, the tax on lobbyists formerly contained in the Clean Elections Act was held to be unconstitutional. That ruling has not been appealed and that issue is not before this court. Moreover, *Milne* does not assist in the analysis here because, unlike the lobbyists in that case, the fine payers whose surcharges funded the Clean Elections Act are a diverse, ephemeral group not "associated" in any meaningful way and not engaged in any First Amendment activity.

Because of their dissimilarity to the case before us, neither *Butterworth* nor *Milne* is helpful in resolving this case.

which the outcome turned on whether the assessment was a fee or a tax. Nonetheless, we address the issue briefly.

¶24    Whether an assessment should be categorized as a tax or a fee generally is determined by examining three factors:  "(1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996) (citing *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683 (1st Cir. 1992)).  All three elements reveal the assessment here as a tax:  It was imposed by citizen initiative on a broad range of payers for a public purpose.  This conclusion does not end the inquiry, however, for even a tax may be imposed in an unconstitutional way or for an unconstitutional purpose.

¶25    May argues that if the surcharge is a tax, it is an unconstitutional "special tax" requiring strict scrutiny because "it is imposed on less than the whole" population of Arizona citizens and burdens the First Amendment rights of a narrowly defined group of taxpayers.  May relies on *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), and *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), to support his contention that taxes on discrete groups are invalid because of the threat that "government will destroy a selected

-14-

group of taxpayers by burdensome taxation." *Minneapolis Star*, 460 U.S. at 585.

¶26 We disagree with May's premise that the surcharge does not apply to all Arizonans. It does; any person who pays a civil or criminal fine is subject to pay the surcharge. Just as any person choosing to purchase a new car or other non-exempt good must pay a tax, any person found to have parked illegally or committed a crime will face the surcharge. No narrow, discrete group of taxpayers is at issue in the case before us, nor are the fine payers exercising a First Amendment right. *Minneapolis Star* and *Murdock* are therefore inapposite.

¶27 The Clean Elections Act's surcharge stands in stark contrast to the tax on paper and ink in *Minneapolis Star* and the attempted license tax on door-to-door religious proselytizing at issue in *Murdock*. The clean elections surcharge is not limited to a particular group or industry, but is assessed against all citizens who pay civil and criminal fines. Nor does the surcharge burden the exercise of a First Amendment right; there is no expressive content inherent in paying a traffic fine. To the extent that civil and criminal fine payers are compelled to fund the Clean Elections Act, the safeguard of viewpoint neutrality in the allocation of funds suffices to mitigate any First Amendment concerns.

**CONCLUSION**

¶28     In summary, we hold that the surcharge funding provision of the Citizens Clean Elections Act, A.R.S. § 16-940(C), is constitutional.  We therefore vacate the opinion of the court of appeals and reinstate the judgment in favor of the Real Parties in Interest.

_____
Rebecca White Berch, Justice


CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Ruth V. McGregor, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
John Pelander, Judge*


    *Pursuant to Arizona Constitution article VI, section 3, the Honorable John Pelander, Judge of the Arizona Court of Appeals, Division Two, was designated to sit on this case.