# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 13, 2023

Lyle W. Cayce
Clerk

_____

No. 22-30564

_____

RANDY BOUDREAUX,

*Plaintiff—Appellant*,

*versus*

LOUISIANA STATE BAR ASSOCIATION,
*a Louisiana Nonprofit Corporation*;
LOUISIANA SUPREME COURT;
BERNETTE J. JOHNSON, *Chief Justice of the Louisiana Supreme Court*;
SCOTT J. CRICHTON,
*Associate Justice of the Louisiana Supreme Court for the Second District*;
JAMES T. GENOVESE,
*Associate Justice of the Louisiana Supreme Court for the Third District*;
MARCUS R. CLARK,
*Associate Justice of the Louisiana Supreme Court for the Fourth District*;
JEFFERSON D. HUGHES, III,
*Associate Justice of the Louisiana Supreme Court for the Fifth District*;
JOHN L. WEIMER,
*Associate Justice of the Louisiana Supreme Court for the Sixth District*;
UNIDENTIFIED PARTY, *successor to the Honorable Greg Guidry as
Associate Justice of the Louisiana Supreme Court for the First District*,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-11962

_____

Before KING, SMITH, and ELROD, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

The First Amendment protects an individual's right both to speak and not to speak. Similarly, it protects one's right to associate and not to associate. *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). Yet every lawyer in this circuit is required to join his or her state bar association to practice law. And those bar associations speak publicly on a variety of issues—some of them very controversial. That raises obvious constitutional concerns.

Although lawyers do not have a categorical First Amendment right to disassociate from their state bar, compulsory bar membership is unconstitutional if a bar's speech is not germane to regulating lawyers or improving the quality of legal services in the state. *Keller v. State Bar of Cal.*, 496 U.S. 1, 13–14 (1990). Two years ago, we made that clear when we held that the State Bar of Texas violated its members' rights to free speech and association by engaging in non-germane political advocacy. *See McDonald v. Longley*, 4 F.4th 229, 237, 245, 252 (5th Cir. 2021) (Smith, J.), *cert. denied*, 142 S. Ct. 1442 (2022).

In response to *McDonald*, the Louisiana State Bar Association (the "LSBA") changed its internal policies and stopped almost all of its legislative activity. But Randy Boudreaux—a lawyer in Louisiana—claims that the LSBA is still flouting that decision. He insists that the organization's ongoing expression is not germane and that his forced membership in the LSBA violates his speech and association rights.

To its credit, the LSBA has stopped much of its objectionable activity. But despite the LSBA's scruples, Boudreaux has still identified some examples of non-germane speech. We therefore reiterate what we said in *McDonald*—if mandatory bar associations are going to compel individuals to

associate and speak, they must stay in their constitutionally prescribed lane. Because the LSBA veers, we AFFIRM in part and REVERSE in part, REMAND, and RENDER an injunction with respect to Boudreaux only.

I.

A.

The LSBA is a mandatory bar association. Attorneys are required to join and pay fees to the organization as a condition of practicing law in the state.[1] Although the organization does not admit, license, or directly discipline lawyers in Louisiana, it still has a large regulatory and informational role. Among other things, it issues advisory opinions about the regulation of lawyers, offers continuing legal education ("CLE") programs, publishes the *Louisiana Bar Journal*, and promotes legal content through emails and social media. In everything, the LSBA's stated mission is "to regulate the practice of law" and "promote the welfare of the profession in the [s]tate."

Additionally, until July 2021, the LSBA engaged in a variety of political speech and advocacy. The House of Delegates (the LSBA's policymaking body) had a Legislation Committee, which adopted formal "policy positions" on proposed policies and pending bills in the state legislature. Though some of those bills implicated the legal profession, they primarily regulated the public at large. To name just a few, the LSBA took positions on anti-discrimination laws for LGBT individuals, compliance with a state equal pay act, a rewriting of the state's high school civics curriculum, a moratorium on

---

[1] *See Articles of Incorporation*, LA. STATE BAR ASS'N (revised Dec. 14, 2021), https://www.lsba.org/documents/Executive/ArticlesIncorporation.pdf ("[N]o person shall practice law in this State unless he/she is an active member, in good standing, of this Association."); *see also* LA. STAT. ANN. § 37:213. The LSBA's Articles of Incorporation have been adopted as rules of the state supreme court. *Lewis v. La. State Bar Ass'n*, 792 F.2d 493, 495 (5th Cir. 1986).

executions in Louisiana pending certain criminal justice reforms, licensure of midwives, and concealed carry by school officials.

Boudreaux has been a member in good standing of the LSBA since 1996. Upset that he was forced to associate with and contribute to the afore-mentioned causes, Boudreaux sued the LSBA, the Louisiana Supreme Court, and its justices (collectively, "the LSBA") in 2019. He claimed that compulsory membership in the LSBA violated his rights to free speech and association.

The defendants moved to dismiss, and the district court granted the motion. The court found that Boudreaux's freedom of association claim was barred by Supreme Court precedent. It also found that any objection to the LSBA's mandatory fees was barred by the Tax Injunction Act, which prohibits challenges to state taxation based on federal law. And finally, the court found that Boudreaux lacked standing to bring a free speech claim because he had not actually objected to speech he disagreed with and had used the LSBA's available opt-out procedures. Boudreaux promptly appealed.

## B.

The Fifth Circuit panel that heard Boudreaux's appeal also heard and decided *McDonald*. *McDonald* was a nearly identical challenge to the State Bar of Texas, which was also a mandatory bar association and also used compulsory member fees on a variety of controversial political advocacy. *McDonald*, 4 F.4th at 239. The plaintiffs brought freedom of speech and freedom of association claims, contending that they could not be compelled to fund speech that they did not support. They also averred that the state bar's "opt-out" procedures were constitutionally insufficient. *Id.* at 241, 252–53.

*McDonald* began by synthesizing a long line of prior caselaw. Around sixty years ago, a plurality of the Supreme Court stated that it did not violate

an individual's freedom of association for a bar association to charge mandatory fees to fund its core functions. *Lathrop v. Donohue*, 367 U.S. 820, 843 (1961) (plurality). But later, in the context of public-sector unions, the Court held that unions could only require non-members to fund "germane" collective bargaining, not unrelated political advocacy. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235–36 (1977). Then, in *Keller*, the Court combined *Lathrop* and *Abood* to hold that a mandatory bar association did not violate the free speech rights of its members as long as the bar's speech was germane to (1) the regulation of lawyers or (2) the improvement of legal services in the state. 496 U.S. at 13–14.

The plaintiffs in *McDonald* suggested that lawyers could not be constitutionally required to join a bar association that engaged in *any* legislative activity. 4 F.4th at 247. That argument echoed the watershed *Janus* decision, which "overruled" *Abood* and held that members of a profession could not be required to fund a public-sector union at all or even to fund the union's generally applicable collective bargaining. *Janus*, 138 S. Ct. at 2459–60, 2486. But *McDonald* noted that *Janus* did not overrule *Keller sub silentio*, even if the latter case now rested on "moth-eaten foundations." *See* 4 F.4th at 243 n.14 (quotation omitted).

Bound by *Keller*, *McDonald* held that the constitutionality of mandatory bar associations still turned on "germaneness." *Id.* at 249; *see also id.* at 246, 252. If a bar association's only speech was germane, then a state could require lawyers to be paying members of a bar association. Conversely, if a bar association engaged in nongermane speech, then it failed heightened First Amendment scrutiny. *Id.* at 246, 252. Because the Texas Bar *did* engage in non-germane activity, its mandatory membership was subject to exacting scrutiny (which it necessarily failed). *Id.*

Finally, *McDonald* held that the procedures of the State Bar of Texas

for notifying members of its speech and giving them a chance to opt-out were constitutionally insufficient. *Id.* at 253. Those protective measures are also known as "*Hudson* procedures," named after *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292 (1986). *Hudson* arose after *Abood*, when unions were permitted to charge non-members fees for germane collective bargaining activity. *Id.* at 294. The Court thus held that unions were required to give non-members adequate explanation of how their money was being spent and an opportunity to get a refund if the union broke the rules. *Hudson*, 475 U.S. at 310. *Keller* suggested that a bar association could also satisfy its First Amendment obligations by "adopting the sort of procedures described in *Hudson*." *Keller*, 496 U.S. at 17.

But in *McDonald*, the Texas Bar's procedures "[did] not furnish Texas attorneys with meaningful notice regarding how their dues [would] be spent. Nor [did] it provide them with any breakdown of where their fees go." *McDonald*, 4 F.4th at 254. Therefore, the plaintiffs were entitled to relief on their free speech, free association, and inadequate notice claims.

## C.

On the same day that we issued *McDonald*, we resolved Boudreaux's appeal. *Boudreaux v. La. State Bar Ass'n* (*Boudreaux I*), 3 F.4th 748 (5th Cir. 2021). Echoing *McDonald*, we made it clear that Boudreaux would have a valid free association claim if the LSBA engaged in non-germane speech. "Discovery may bear out that LSBA does not actually engage in any non-germane activity." *Id.* at 756. But we reversed and remanded for discovery on the nature of the LSBA's activities. *Id.* We also held that the Tax Injunction Act did not apply to professional fees, so the district court had jurisdiction over Boudreaux's speech claim. *Id.* at 758. And finally, we held that Boudreaux had standing to challenge opt-out procedures even if he had not used them—his alleged injury was the inability to adequately discover what

the LSBA was up to. *Id.* at 760. We ultimately remanded for the district court to follow *McDonald* and proceed to the merits.

### D.

Just six days after *McDonald* and *Boudreaux I* were announced, the LSBA suspended its Legislation Committee and all of its legislative activities. The suspension was set to last from July 2021 until January 2022, when the House of Delegates was next slated to meet. In the meantime, the Louisiana Supreme Court adopted a new rule, codifying the germaneness requirement from *McDonald*. According to the new rule,

> [t]he LSBA shall limit its activities to those that are constitutionally germane to its purposes, and shall limit its legislative activities to issues involving practice and procedure, the judicial system, access to the courts, the compensation of judges or lawyers, or the legal profession, and to responding to any requests for information received from the legislature. Any legislative positions on issues within the scope of this rule shall be voted upon and approved in advance by the LSBA's Board of Governors and thereafter published to members of the LSBA.

La. S. Ct. R. XVIII, § 6.

Then, at the House of Delegates's January 2022 meeting, the LSBA (1) rescinded all its existing policy positions, (2) revised the LSBA's bylaws accordingly, and (3) suspended any activity "not within [the] scope" of Rule XVIII, § 6. And although LSBA previously paid for a lobbyist, its new budget allocated just $10,000 to monitor potential legislation that could be germane under *McDonald*. Indeed, Boudreaux concedes that since *McDonald*, "the LSBA has not engaged in legislative activity."

The LSBA's post-*McDonald* changes work in concert with the organization's preexisting notice and objection procedures. When the LSBA engages in speech, it notifies its members in a variety of ways. For one, it

No. 22-30564

publishes both prospective annual budgets and retrospective audited revenue reports. Members may always ask for more detail about expenditures by emailing the bar's treasurer. Any legislative positions are also emailed to members in so-called "Bar Briefs." Additional activities are regularly announced through email, Facebook, Twitter, and Instagram.

If an LSBA member objects to his funds being used to support a particular cause (legislative or otherwise), he has 45 days to notify the LSBA in writing. The *pro rata* amount of dues contributed to the activity in question is placed into escrow until the objection has been resolved.[2] The Board then reviews the objection and issues a refund within 60 days (or refers the matter to arbitration). The district court found that all timely objections have so far resulted in refunds. Nevertheless, Boudreaux has not used the formal objection procedures to protest any of the LSBA's activities since *McDonald*.

E.

Notwithstanding the LSBA's reforms, Boudreaux moved for a preliminary injunction in district court following *Boudreaux I*. The district court considered the motion as part of a bench trial on the merits. It ultimately entered judgment in favor of defendants, denying the motion for a preliminary injunction, and dismissing Boudreaux's complaint with prejudice.

The district court explained that it found most of Boudreaux's claims to be moot. Because the LSBA had ceased its legislative activity, disbanded the Legislation Committee, and limited future political speech to germane activity within the definition of *McDonald*, there was no live controversy between the parties—at least in regard to pre-*McDonald* speech. Similarly,

---

[2] For legislative activities, the *pro rata* amount is calculated as a percentage of *all* the LSBA's legislative activity, not just the particular position that the objecting member opposes.

No. 22-30564

any claims about future speech were speculative and unripe. The only justiciable disputes between the parties were the allegations that the LSBA had engaged in non-germane speech between *McDonald* and the trial.

Yet the district court still ruled against Boudreaux on the merits of his remaining First Amendment claims. Before trial, the parties stipulated to a list of the LSBA's speech that was in dispute. The district court went through those examples blow-by-blow, finding that the challenged speech was either germane under *McDonald* or not a "major activity" of the LSBA, and therefore not a constitutional violation. It also found that the LSBA's notice procedures were adequate.

Boudreaux appeals the judgment for the second time. "The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 353 (5th Cir. 2015) (quotation omitted).

## II.

A mandatory bar association can require lawyers in its jurisdiction to be members and pay dues to the bar only if its speech is "germane." *McDonald*, 4 F.4th at 245. Speech is "germane" to a bar association's purposes if it is "necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'" *Keller*, 496 U.S. at 14 (quoting *Lathrop*, 367 U.S. at 843). If a bar's speech activities are germane, then there is no free association or free speech problem with compulsory membership. *McDonald*, 4 F.4th at 246. But if a bar engages in non-germane speech, then forced membership is subject to "exacting scrutiny," which it "fails." *Id.*[3]

---

[3] *McDonald*'s First Amendment analysis was identical for both the plaintiffs' freedom of association claim and their freedom of speech claim. *Compare* 4 F.4th at 245–46

That raises three questions for our review. *First*, what speech can we consider in this case? That is, which claims are justiciable after the LSBA's post-*McDonald* reforms? *Second*, is the LSBA's ongoing speech germane? And *third*, are the LSBA's notice and opt-out procedures constitutionally adequate? We will address each issue in turn.

## A.

We begin, as we must, with justiciability. Article III limits our jurisdiction to "live" cases and controversies. *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 831 (5th Cir. 2023). A case is no longer live if "the parties lack a legally cognizable interest in the outcome,"[4] or it becomes "impossible for a court to grant any effectual relief whatever to the prevailing party."[5] If any set of circumstances eliminates the "actual controversy" during the duration of the lawsuit, the case becomes moot. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006).

To determine whether Boudreaux's claims are moot, we proceed "claim-by-claim." *United States v. Vega*, 960 F.3d 669, 673 (5th Cir. 2020). The complaint lists three counts: a challenge to mandatory membership, a challenge to mandatory bar fees, and a challenge to the LSBA's notice and opt-out procedures. Yet, at no point in *McDonald* did the First Amendment analysis turn on the difference between membership and dues. *See* 4 F.4th at 246, 252, 255. Both *Lathrop* and *Keller* focused on compulsory dues, *see Keller*, 496 U.S. at 9 (citing *Lathrop*, 367 U.S. at 827–28), but *McDonald*

---

(freedom of association discussion), *with id.* at 252 (freedom of speech discussion). So too here. The speech and association claims rise and fall together.

[4] *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation omitted).

[5] *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (quotation omitted) (cleaned up).

applied those cases to the question of whether "lawyers may constitutionally be mandated to *join* a bar association." 4 F.4th at 244 (emphasis added). And in conclusion, *McDonald* made clear that compulsory bar membership and fees both implicate the First Amendment and both turn on "germaneness." *See id.* at 255.

Therefore, it is more helpful to distinguish among Boudreaux's specific post-*McDonald* contentions. *First*, he contends that his forced membership in the LSBA violates his First Amendment rights *even if* the LSBA engages only in germane speech. In effect, he asks us to go one step beyond *McDonald* and declare a *per se* ban on mandatory bar associations. *Second*, Boudreaux claims that the LSBA violates *McDonald* by engaging in non-germane speech. And *third*, he alleges that the LSBA's *Hudson* procedures are inadequate.

No one disputes that the first and third claims are justiciable. Louisiana still requires Boudreaux to be a member of the LSBA and pay dues, and the LSBA has not meaningfully changed its opt-out procedures since the case was filed. Those are "live" disputes. But the justiciability of Boudreaux's *McDonald* claim depends on the particular speech in question. Boudreaux targets three categories of LSBA speech: (1) its pre-*McDonald* activity, (2) its post-*McDonald* activity, and (3) any potential future activity. Only the second of those disputes is "live."

Boudreaux's claim that the LSBA's pre-*McDonald* activity violates the First Amendment is moot because the LSBA has ceased all the conduct that Boudreaux originally challenged. After *McDonald*, the LSBA terminated all legislative activity. It abolished its special political arm and consolidated all lobbying activity in its general governing board. And it incorporated Louisiana Supreme Court Rule XVIII, Section 6, into its bylaws, which prohibits the LSBA from engaging in any non-germane speech. In short, the LSBA's

No. 22-30564

official policy is that it will do no more than we declared was lawful in *McDonald*. Boudreaux even concedes that since *McDonald*, there have been no legislative activities of the kind he complained about before *McDonald*.

True, voluntary cessation does not normally moot a case. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). If a defendant willingly stops complained-of conduct, we can still adjudicate the dispute unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) (quotation omitted), *aff'd*, 563 U.S. 277 (2011).

But where the defendant is a government actor, the presumption flips. We presume that state actors "act in good faith," *Freedom From Religion Found.*, 58 F.4th at 833, and that "formally announced changes to official governmental policy are not mere litigation posturing," *Sossamon*, 560 F.3d at 325. So, for example, when the state of New York amended a gun law that had been challenged on Second Amendment grounds, the Supreme Court dismissed the appeal as moot, even though the amendment might otherwise have been voluntary cessation. *See N.Y. State Rifle & Pistol Ass'n v. City of New York* (*NYSRPA*), 140 S. Ct. 1525, 1526 (2020) (per curiam).

Here, the LSBA—the state agency for regulating lawyers—changed its bylaws and procedures to accord with *McDonald*. That is the kind of formal change contemplated by *Sossamon*. "[N]othing in the record suggests that the Board will reimplement" its older, illegal policy positions. *Freedom From Religion Found.*, 58 F.4th at 833. To the contrary, the LSBA has avoided all non-germane legislative advocacy since *McDonald*.

Boudreaux points out that the LSBA has not renounced its prior political advocacy. But there is no requirement that a government actor renounce its prior conduct in order to moot a case. For example, in

*NYSRPA*, the State of New York did not renounce its prior limitations on concealed carry, but amended the law only to obviate the alleged injury. *See* 140 S. Ct. at 1526. That is effectively what the LSBA did here. To the extent Boudreaux wants the LSBA to stop its past conduct and follow *McDonald*, there is nothing we can do by court order that the LSBA has not done already. *See id.* Therefore, Boudreaux's pre-*McDonald* challenges to the LSBA's past conduct are nonjusticiable.

Boudreaux responds that the LSBA's past speech proves that there is always a risk of future non-germane speech. In effect, Boudreaux wants a prospective ruling barring the LSBA from any future non-germane conduct. Yet that is a textbook example of an unripe dispute. *See Nike*, 568 U.S. at 97. A plaintiff has no standing to seek prospective relief "merely on the basis of being 'once bitten.'" *Id.* at 98 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). The possibility that the LSBA will engage in non-germane advocacy after *McDonald* is pure conjecture. If someday in the future the LSBA appears to violate Boudreaux's rights, he is more than welcome to bring a lawsuit. But until he is actively being aggrieved—or faces the imminent threat of illegal actions—his claim is not justiciable.

Nevertheless, Boudreaux still has his claims that the LSBA did speak and continues to speak in non-germane ways after *McDonald*. That is an ongoing dispute that we have the power to adjudicate. The district court rightly held that those claims were justiciable and considered them on the merits. We do the same.

## B.

The LSBA violates Boudreaux's speech and association rights only if its speech is non-germane to the regulation of lawyers or the improvement of legal services. *McDonald*, 4 F.4th at 246.

1.

At the outset, Boudreaux contests that premise.  He insists that his rights to free association and speech are harmed *even if* the LSBA only engages in germane speech.  Recall that a state cannot compel non-union members to subsidize public-sector unions, even if the unions use those dues only on germane collective bargaining.  *Janus*, 138 S. Ct. at 2459–60, 2464.  Relying on that reasoning, Boudreaux effectively asks us to hold that mandatory bar associations violate the First Amendment, full stop.

But that contradicts *Keller*, which held that "[t]he State Bar may . . . constitutionally fund activities germane to [its] goals out of the mandatory dues of all members."  *Keller*, 496 U.S. at 14.  It also flies in the face of *McDonald*, where we held that "the plaintiffs *can* be compelled to join the Bar if it ceases its non-germane activities."  *McDonald*, 4 F.4th at 253 n.41.

It is true that *Janus*, by overruling *Abood*, cast serious doubt on *Keller*'s premise that bar associations can require membership and fees to advocate for germane causes.  At least two Justices are willing to reconsider "whether *Keller* is sound precedent" in light of *Janus*.  *Jarchow v. State Bar of Wis.*, 140 S. Ct. 1720, 1721 (2020) (Thomas, J., dissenting from the denial of certiorari, joined by Gorsuch, J.).  But as a lower court, we are bound by *Keller*.  We are also bound to *McDonald* by this circuit's rule of orderliness.[6]

*McDonald* requires "exacting" First Amendment scrutiny of a mandatory bar association that engages in non-germane speech.  4 F.4th at 246, 252.  But if a state bar engages only in germane speech, there is neither a free speech nor a free association violation.  *See id.* at 246.  We must therefore

---

[6] *United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." (quotation omitted)).

decide whether the LSBA's challenged speech is germane.

## 2.

To be "germane," bar association speech must be reasonably related to the bar association's purposes of (1) regulating the legal profession or (2) improving the quality of legal services. *McDonald*, 4 F.4th at 244 (citing *Keller*, 496 U.S. at 13–14). Although the Supreme Court has not given precise guidance about what degree of relatedness is required, it has described a spectrum: Advocacy regarding gun control would be obviously non-germane, but activities related to lawyer discipline would be obviously germane. *Keller*, 496 U.S. at 16. Where the LSBA's activity falls on that spectrum depends on the particular speech at issue.

Before trial, Boudreaux stipulated to which activities of the LSBA he was challenging. Most of those were pre-*McDonald* legislative activities or policy positions, all of which the LSBA has ceased or rescinded. As described above, Boudreaux's challenges to that speech are moot. That leaves a very short list of activity that is allegedly illegal: seventeen tweets and emails that post-date the LSBA's July 2021 reforms. On appeal, he also contests the LSBA's remaining policy positions on law-related subjects. And finally, at oral argument, Boudreaux pointed out several messages that the LSBA released on its website related to LGBT "Pride Month." We consider each in turn.

### i.

Boudreaux begins by suggesting that even after *McDonald*, the LSBA takes several "policy positions" on law-related policy proposals. For example, the LSBA takes positions on "taxation of legal services," and "access to justice" initiatives.

But Boudreaux forfeited any challenge to those policy positions. For

one thing, they are not included in his stipulated list of challenged activities. Nor, does it seem, were they raised at trial, even though Boudreaux had the opportunity to do so.[7]  Even if we were to consider them, the LSBA's policy positions are directly related to the regulation of the legal profession and the provision of legal services.  In *McDonald*, we held that lobbying about the "appointment of *pro bono* volunteers" and "the law governing lawyers" was germane.  4 F.4th at 248.  The LSBA's extant legislative efforts are comparable and therefore lawful.

ii.

Next, Boudreaux challenges a group of "Wellness Wednesday" tweets relating to the health and wellbeing of lawyers.  For example, the LSBA "tout[ed] the purported benefits of walnuts," "urg[ed] readers to . . . work out at least three times per week," and encouraged lawyers to get "sunlight."

Those statements fail the germaneness test from *McDonald* and *Keller* because they do not sufficiently relate to legal practice or the legal profession. Even assuming healthier lawyers are generally more effective lawyers, the LSBA is not an all-encompassing wellness service that may comment on every facet of lawyers' health and fitness.  We generally give bar associations leeway in determining how best to improve legal services, as is appropriate given their expertise in regulating the legal profession.  *See McDonald*, 4 F.4th at 249.  But if bar associations may opine, advise, and inform on anything that they deem is generally conducive to attorney health and wellness, there is no limiting principle.

If a bar association may tout the health benefits of broccoli, may it also

---

[7] *See Offshore Drilling Co. v. Gulf Copper & Mfg. Corp.*, 604 F.3d 221, 225 (5th Cir. 2010) ("Issues not raised in the district court . . . are not considered.").

advise attorneys to practice Vinyasa yoga, adhere to a particular workout regimen, or get married and have children, if it believes that those activities improved attorney wellness and therefore the quality of legal services in the state? How remote or indirect can the purported benefit to legal services be? The LSBA offers no clear answer, nor can we discern any principled line once we allow advice that is not inherently tied to the practice of law or the legal profession.

The germaneness standard therefore requires inherent connection to the practice of law and not mere connection to a personal matter that might impact a person who is practicing law. Promoting diversity efforts at law firms is germane, but opining on affirmative action is not. Raising awareness of the failure of firms to retain women is germane, but speech encouraging or discouraging abortion (or abortion insurance coverage for attorneys) is not. Similarly, advice about software designed for attorneys' use is germane, but recommending that all attorneys purchase new iPhones is not.

If a bar association provides advice, that advice must inherently relate to the legal profession or the practice of law. Advice is not germane just because, in the association's view, it improves "wellness" and therefore the practice of law indirectly. Although walnuts, exercise, and Vitamin D may be beneficial, they fall outside the LSBA's purview, at least when they are the basis of generic advice to attorneys about health and fitness.

Another set of tweets regarding technology and safety announcements are not germane for similar reasons. One tweet informed lawyers about an iPhone software update, as it would bring "new upgrades" to the Notes application. Those, too, are not inherently about the practice of law or the legal profession more generally. They therefore do not sufficiently relate to improving the practice of *law* in the state. *See id.* at 247.

No. 22-30564

iii.

Third, Boudreaux objects to tweets promoting community-engagement opportunities for lawyers. Specifically, the LSBA notified lawyers of the 69th Annual Red Mass at St. Louis Cathedral (a Catholic service celebrating all members of the legal profession, regardless of religious affiliation), and it informed members of holiday charity drives for Christmas and Halloween. The LSBA responds that it is important for lawyers in the state to participate in community events and *pro bono* work.[8] Those bring goodwill to the legal profession, which in turn improves the perception and practice of law in the state.

We agree with Boudreaux. We acknowledge that something "ideologically charged" may still be germane. *McDonald*, 4 F.4th at 249 n.28. Indeed, *McDonald* allowed the Texas Bar to host a "directory" that "merely provide[d] information for attorneys interested" in *pro bono* opportunities "to connect with related organizations." *Id.* at 251. But—critically—that directory centered on *legal* rather than *generic pro bono* and charitable opportunities and included activities such as supporting criminal defense, addressing improper attorney conduct, helping with tax issues, and making legal services accessible to low-income persons. *See id.* at 251 & n.34. Likewise, Louisiana's Code of Professionalism focuses on attorneys' "responsibility to the judicial system, the public, our colleagues, and the rule of law." *Code of Professionalism*, LA. STATE BAR ASS'N, *supra*.

With those examples in mind, we turn to the LSBA actions Boudreaux challenges. Generic Christmas and Halloween charity drives may be helpful

---

[8] *See Code of Professionalism*, LA. STATE BAR ASS'N, https://www.lsba.org/Members/LegalLibrary.aspx (last visited July 27, 2023) (calling on lawyers to "work to protect and improve the image of the legal profession in the eyes of the public").

to the community, and they may even—in some diffuse sense—increase goodwill toward the legal profession.  But unlike the *pro bono* provision of *legal* services, they are not sufficiently germane to the regulation of the legal profession or the improvement in quality of legal services.  *See McDonald*, 4 F.4th at 250–51.  If the LSBA wishes to engage in charitable activities and give back to the community, it should do so.  But those efforts must be germane, and they generally are not germane unless they involve the LSBA's character as a legal organization rather than a generic organization or a collective of charity-minded individuals.

This analysis also exposes the inherent problem with the LSBA's defense of "goodwill," which suffers from the same line-drawing problem that its defense of "wellness" did.  We generally defer to bar associations' policy decisions on how best to regulate the legal profession.  *McDonald*, 4 F.4th at 249.  But if anything that purportedly promoted "goodwill" were germane because it, in some attenuated fashion, improved the quality of legal services, there would be almost no limit to what bar associations could do in the name of goodwill, whether it be taking public stances on controversial issues to curry favor among certain segments of the electorate or advertising activities entirely unrelated to the law.  The distinction is akin to the one between content and viewpoint:  Today, we restrict content by requiring some direct relation to legal practice but leave it to the LSBA to determine how it should best operate within those constraints.

The same applies to advertisements of community events:  Although they may increase goodwill abstractly, they are not inherently related to actual legal practice.  The LSBA's charity drives and advertisement of the Red Mass were therefore not germane.

iv.

The LSBA's ventures into the realm of public policy and social issues

are also not germane. In August 2021, the LSBA shared a Reuters article with the caption: "An in-depth look at ways the [American Bar Association] . . . has focused on student loan debt over the past year, and the effects that debt has had on many young lawyers' life decisions."

Certainly, that article is specific to lawyers. The test from *McDonald*, however, is not about whether speech is "law-related," but whether it is related to "*regulating* the legal profession and *improving the quality* of legal services." *See* 4 F.4th at 250. That tweet falls short of that standard. It is not clear how merely reading the article would improve a lawyer's practice. The article just details the burden that debt can impose on a young lawyer and then highlights the Administration's and the American Bar Association's efforts to enact loan forgiveness.[9] If anything, the thrust of the article is backhanded support for student-debt relief, a nakedly political position.

The LSBA suggests that information about looming policy changes can itself be a benefit where lawyers care about the information or the information is relevant to their lives. And undoubtedly, young lawyers care about student debt.[10] But they also care about myriad things, including healthcare, family policy, social issues, criminal justice reform, even interest rates and financial news. Can the LSBA share news articles about those topics too? We are chary of any theory of germaneness that turns a mandatory bar

---

[9] *See* Karen Sloan, *'Debt transformed my life': Lawyers weigh in on student loan reprieve*, REUTERS (Aug. 10, 2021), https://www.reuters.com/legal/government/debt-transformed-my-life-lawyers-weigh-student-loan-reprieve-2021-08-10/.

[10] A 2020 American Bar Association survey of law school graduates revealed that over 95% of students took out a loan to finance their J.D., and the average law school graduate had approximately $165,000 in total student loans. AM. BAR ASS'N, *2020 Law School Student Loan Debt: Survey Report* 7 (2020), https://www.americanbar.org/content/dam/aba/administrative/young_lawyers/2020-student-loan-survey.pdf.

No. 22-30564

association into a mandatory news mouthpiece. If a mandatory bar association can say or promote anything "of concern to lawyers," it is difficult to see any limit to what the LSBA could say or promote. That is to say: The germaneness test is not satisfied just because a particular personal matter might impact a person who is practicing law.

Instead, speech must be reasonably related to the regulation or improvement of legal practice. That generally means that speech engaging with, promoting, or encouraging participation in wider public policy and social controversies is rarely, if ever, germane. A tweet apprising lawyers of the difficulty of student loans and possible student-loan reform fails that standard.

v.

Finally, at oral argument, Boudreaux directed our attention to several documents published or promoted by the LSBA before and during June, which the federal government recognizes as "Pride Month."[11] We take judicial notice[12] of one of them: a link to a History.com article about gay rights, along with a large rainbow flag icon that read "LGBT Pride Month."[13]

---

[11] Proclamation No. 10590, 88 Fed. Reg. 36447 (May 31, 2023).

[12] *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam) (explaining that a Fifth Circuit panel can "tak[e] judicial notice of the state agency's own website"); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (noting that courts may take judicial notice of matters of public record when ruling on a Federal Rule of Civil Procedure 12(b)(6) motion); *Dusterhoft v. City of Austin*, 2023 WL 6785842, at *2 n.6 (5th Cir. Oct. 13, 2023) (per curiam) (unpublished) (judicial notice of city's organizational chart) (citing *Funk*, 631 F.3d at 783). The LSBA does not dispute the existence of the Pride flag icon and link, but only their legal relevance.

[13] Boudreaux himself openly identifies as a gay man and claims that he does not disagree with the bar's messaging, but only that he is compelled to participate in it by dint of his forced membership.

No. 22-30564

Obviously, affirmative action programs and many LGBT causes are fraught with controversy. As we discussed in *McDonald*, what some consider to be inclusive language, attitudes, or hiring practices, others view as divisive or objectionable. *McDonald*, 4 F.4th at 249. Indeed, the Supreme Court just made clear that racial affirmative action—done in the name of "diversity"—was itself race-based discrimination and unconstitutional. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230–31 (2023). And many Americans still object to certain LGBT causes "based on decent and honorable religious or philosophical premises." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015).

The *Keller/McDonald* test is not whether speech is *objectionable*, but whether it is *germane*. *McDonald*, 4 F.4th at 249. Speech germane to the regulation and improvement of legal services might be "highly objectionable, but it is unconstitutional only if it is unreasonably unrelated to the goals identified by *Keller* and *McDonald*. *Id*.

Thus, in *McDonald*, we held that the Texas Bar could engage in initiatives that sought to diversify the legal profession "for minority, women, and LGBT attorneys." *Id*. We stated that, "[d]espite the controversial and ideological nature of those diversity initiatives, they are germane to the purposes identified by *Keller*." *Id*. That was because the programs were tied to the diversity of *lawyers*, which in turn was tied to the quality of legal services. *Id*. at 249–50. Subjects such as health and abortion are personal matters, whereas diversity in an office has a more direct effect on workplace interactions, which are not so private.

The LSBA's pride flag icon, with its associated link, lacks the necessary hallmarks of germaneness. For starters, it is a general statement about "LGBT Pride Month" that offers neither advice nor opportunities, and it is not made specific to lawyers. Moreover, the article it links is a generic history

No. 22-30564

of gay rights in the United States, tinged with various normative claims about society.[14] Neither the article, the LSBA's icon promoting the article, nor the surrounding context draws a link between the interests of "LGBT causes" in society writ large and the improvement of legal practice in the state.

The LSBA tries to minimize the pride flag, saying that Pride Month is nationally recognized and related to diversity in the profession. But again, there is a difference between diversity in the profession and diversity in broader society, with which LSBA lawyers may be concerned. One is germane, the other not.

We addressed the same issue concerning the article on student loan debt. Just because lawyers are interested in a general social issue does not give a mandatory bar association blanket permission to promote content or speak about it. So too, the LSBA can promote inclusion of LGBT individuals in the legal profession—we held that Texas could do that, even if was controversial. *Id.* at 249–50. But the LSBA may not promote LGBT causes generally, with no connection to the legal profession.

*     *     *     *     *

In sum, the majority of speech Boudreaux objects to is germane. Speech can be germane even if it is "controversial and ideological." *Id.* at 249. But the LSBA crossed the line when it promoted purely informational articles absent any tailoring to the legal profession. That includes the LSBA's tweet about student-loan reform and its promotion of the History.com article through a pride flag icon. Advancing generic political and social messages in those ways violates the First Amendment rights of the LSBA's dissenting

---

[14] *See Pride Month 2023*, Hist. (May 8, 2023), https://www.history.com/topics/gay-rights/pride-month.

members.

3.

The LSBA responds that even if some of its speech was non-germane, it was *de minimis* and therefore lawful under *McDonald*. The district court agreed, finding that bar association speech does not create a First Amendment problem unless it is a "major activity."

But we decline to recognize a *de minimis* exception to the rule from *Keller* and *McDonald* for two reasons. *First*, our caselaw does not support it. *Keller* and *McDonald* categorically state that bar associations cannot engage in non-germane speech. *See McDonald*, 4 F.4th at 237; *cf. Keller*, 496 U.S. at 14. Although the plurality opinion in *Lathrop* ruled for the bar association in part because its challenged legislative activity was not "major," 367 U.S. at 839, neither *Keller* nor *McDonald* picked up on that stray adjective.[15] Instead, *Keller*'s and *McDonald*'s holdings center on the germaneness *vel non* of the bar association's speech. *See McDonald*, 4 F.4th at 237; *cf. Keller*, 496 U.S. at 14.

The LSBA points out that, even in *Keller* and *McDonald*, the bar associations openly engaged in major political advocacy. Yet, just because those decisions addressed major political speech by the respective bar associations does not mean their holdings are limited to cases where the bar's speech is "major." Indeed, in *McDonald* we held that "*some* of the [state bar's] legislative program [was] non-germane, so compelling the plaintiffs to join an

---

[15] *McDonald* does acknowledge that there was some question in *Lathrop* about whether all of the bar association's advocacy was germane. *See McDonald*, 4 F.4th at 248 n.23 (citing *Lathrop*, 367 U.S. at 836–37). But *Lathrop*'s ultimate rule, according to *McDonald*, is that "lawyers may constitutionally be mandated to join a bar association that *solely* regulates the legal profession and improves the quality of legal services." *Id.* at 244 (emphasis added).

association engaging in it violates their freedom of association." *Id*. at 249 (emphasis added). The same is true in this case.

*Second*, a *de minimis* standard is unworkable in the context of free speech. It would put judges in the position of deciding whether speech is objectionable *enough* to raise First Amendment problems.

The LSBA suggests that its speech is *de minimis* not because it is inoffensive, but because it is an insignificant proportion of the bar's overall speech (one tweet and one website posting over a multi-year period). Yet that rule is equally unwieldy. Judges would still have to decide the subjective point at which there is *enough* non-germane speech for the Constitution to kick in. Worse, it would give bar associations ominous freedom to characterize highly objectionable speech as "*de minimis*." Imagine, for example, that a bar association sends 1,000 anodyne tweets in a year but uses one tweet to support the repeal of all antidiscrimination laws. There is no doubt that some members would oppose their funds' being used for such a message, even if it was 0.1% of the organization's overall speech. Even minor amounts of speech—if forced on an unwilling speaker—are repugnant to the Constitution.

The LSBA protests that if every single tweet and email must be strictly "germane," then mandatory bar associations could not exist. The risk would be too great of making some statement that a court found insufficiently linked to the bar association's purposes. But that doomsday theory is unpersuasive. In effect, the LSBA asks us to say that even though the Constitution prohibits non-germane speech by mandatory bar associations, we should allow a *little* bit of non-germane speech because the wholesale eradication of mandatory bars is undesirable. Not so. *McDonald* lays down the constitutional rule, and bar associations must adapt accordingly. It is not an impossible burden for bar associations to speak only on topics germane to their purposes.

Eschewing a *de minimis* exception, we conclude that the LSBA was engaged in non-germane speech. "Compelled membership in a bar association that engages in non-germane activities . . . fails exacting scrutiny." *McDonald*, 4 F.4th at 246. "Although states have interests in allocating the expenses of regulating the legal profession and improving the quality of legal services to licensed attorneys, they do not have a compelling interest in having all licensed attorneys engage as a group in other, non-germane activities." *Id.* The LSBA's mandatory membership and dues are therefore unconstitutional.

## C.

Boudreaux also alleges that the LSBA's notice and opt-out mechanisms (i.e., its *Hudson* procedures) are insufficient. *Hudson* procedures are a "constitutional prerequisite to a state bar's collection of mandatory dues." *Boudreaux I*, 3 F.4th at 758. They are prophylactic "safeguards" designed to prevent the spread of non-germane activities. *Id.* at 759. At a minimum, a bar association must give members (1) adequate notice of the bar association's speech and activities, (2) a reasonably prompt opportunity to challenge the speech before an impartial decisionmaker, and (3) escrow for the amount reasonably in dispute while such challenges are pending. *See Hudson*, 475 U.S. at 310; *McDonald*, 4 F.4th at 253–54.

No one disputes that the second and third requirements of *Hudson* are met here. Members of the LSBA may object to a speech activity at any time, which causes the LSBA to put a *pro rata* share of that member's bar fee in escrow. And every timely objector has thus far received a refund. Instead, Boudreaux complains that he has inadequate notice of the bar's speech activities, the first and fundamental requirement of *Hudson*.

For starters, Boudreaux takes issue with the LSBA's proposed budget. He claims that he is unable to "identify" illicit "expenditures that . . . the

[LSBA] has improperly classified as germane." *Boudreaux I*, 3 F.4th at 760 (quotation omitted). He analogizes it to inquiry notice, because individual attorneys are responsible for investigating the bar's activities, noting objectionable speech, and protesting appropriately. He says that is what we found inadequate in *McDonald*. *See* 4 F.4th at 254.

But this case is readily distinguishable from *McDonald*. On the front end, the Texas Bar only gave members notice of how their money was being spent by publishing a generic budget with "itemize[d] expenditures" and giving members an opportunity to object at the budget meetings. *Id.* at 253. And on the back end, the Texas Bar gave "precious few worth-while options" to an attorney "to express his or her disapproval" of objectionable speech, as complaints could be "summarily overruled" in the "sole discretion of the Bar's Executive Director." *Id.* at 254.

On the first front, there are differences between the LSBA's budget and the Texas Bar's budget in *McDonald*. The LSBA also publishes an itemized prospective budget and gives members budget-level input. Yet based on its post-*McDonald* reforms, *no* expenditures in the budget are set aside for non-germane activities. Indeed, the LSBA cites *McDonald* on the cover sheet of its 2022–2023 budget to contextualize all its listed expenses. The LSBA also provides members with audited reports at the end of the year explaining how mandatory dues and other revenue were spent.

Admittedly, the LSBA's budget has mostly generic descriptions of expenditures. Things like "Lobbying" are listed under the heading "Governmental Relations" without any additional explanation (although, notably, the post-*McDonald* proposed budget cuts the governmental relations line items down to $0 in all categories). But in *Hudson*, the Court said that a union "need not provide nonmembers with an exhaustive and detailed list of all its expenditures," suggesting that "adequate disclosure" would "include the

major categories of expenses, as well as verification by an independent auditor." 475 U.S. at 307 n.18. A union was permitted to have a line item such as "payment [to] its affiliated state and national labor organizations," so long as there was a "showing that none of it was used to subsidize activities for which nonmembers may not be charged." *Id.* And here, the LSBA's generic budget categories are coupled with a disclaimer in the budget and the assurances in its bylaws that its speech activity will abide by *McDonald*'s germaneness rule.

Indeed, although *Hudson* applies with full force in the bar association context, *Boudreaux I*, 3 F.4th at 759, a prospective budget can only provide so much notice when a bar association can and must classify all of its speech activities as germane. Recall that *Hudson* was contrived after *Abood*, when unions were allowed to charge non-members for collective bargaining fees but not non-germane activity. *Hudson*, 475 U.S. at 294. Therefore, unions needed to differentiate between "chargeable" and "nonchargeable" expenses up front and explain the difference to non-members. *See McDonald*, 4 F.4th at 253–54. *McDonald* similarly prohibits mandatory bar associations from engaging in non-germane speech, but it does not create two classes of payers (members and non-members) and two classes of fees (chargeable and not). *No* member's dues can be used for non-germane activities without violating the First Amendment. *See id.* at 246.

And when it comes to non-legislative activities, a bar association cannot realistically predict in its budget what it will tweet or email about over the course of a year. It can promise to abide by *McDonald*, but the threat is back-end failures to comply with its own rules. In such cases, *Hudson* and *McDonald* require that bar associations give adequate notice of ongoing and developing speech activities. *See Boudreaux I*, 3 F.4th at 759.

On that front, the difference between *McDonald* and the instant case

is even more stark. In *McDonald*, the Bar failed to notify members of ongoing speech, and members had "precious few worth-while options to express his or her disapproval" to specific speech after the fact. *McDonald*, 4 F.4th at 254. But here, the LSBA gives members a summary of its legislative positions in emailed "Bar Briefs," updates members about its other activity through emails and the *Bar Journal*, and regularly updates members about its activities through social media. Indeed, all of the speech Boudreaux objects to was in widely disseminated communications or website postings. After extensive discovery, Boudreaux did not identify a single example of speech that he would have objected to but did not because of insufficient notice. What is more, both parties agree that the opt-out procedures here are meaningful, not illusory. Boudreaux merely chose not to use them.

Taking all of the LSBA's notice mechanisms together—its budget, its compliant bylaws, and its extensive public communications about its activities—a reasonable member of the LSBA would know about the speech activities of the bar. And the LSBA gives members a meaningful opportunity to object before an impartial decisionmaker and get a refund of their contribution to the objectionable speech. That satisfies *Hudson* and *McDonald*. To the extent Boudreaux is harmed in this case, it is not from a lack of notice. It is from the LSBA's decision to promote non-germane speech in the first place.[16]

### III.

If a bar association is going to force individuals to associate with and

---

[16] Although the LSBA's notice and objection procedures are constitutionally adequate, Boudreaux's decision not to use those procedures does not prevent him from bringing a § 1983 claim in federal court based on the violation of his First Amendment rights. Section 1983 includes no requirement that plaintiffs first exhaust state law remedies. *See Pakdel v. City and Cnty. of San Francisco*, 141 S. Ct. 2226, 2230 (2021).

pay for speech, that speech must be germane.  Although judging germaneness is difficult, *see Janus*, 138 S. Ct. at 2481–82, we are bound to police the line that *Keller* and *McDonald* laid down.  We have noted several instances of non-germane speech by the LSBA, including, *inter alia*, its promotion of the article about student loan policy and its icon and link celebrating Pride Month.  Because the LSBA engages in non-germane speech, its mandatory membership policy violates Boudreaux's rights to free speech and free association.  Additionally, Boudreaux is entitled to a limited preliminary injunction for the same reasons as were the plaintiffs in *McDonald*.[17]

We therefore AFFIRM the judgment in part and REVERSE in part. We REMAND to the district court for a determination of the proper remedy and for proceedings not inconsistent with this opinion, although we take no position on the proper injunctive or declaratory relief.  We also RENDER a preliminary injunction preventing the LSBA from requiring Boudreaux to join or pay dues to the LSBA pending completion of the remedies phase.

---

[17] Just like the *McDonald* plaintiffs, Boudreaux has succeeded on the merits and has suffered irreparable constitutional injury.  *See McDonald*, 4 F.4th at 255.  An injunction protecting his First Amendment rights is also in the public interest and supported by the balance of the equities.  *Id.*